**Barbara MAJOR, et al., Plaintiffs,**

v.

**David C. TREEN, etc., et al.,
Defendants.**

**Civ. A. No. 82–1192.**

United States District Court,
E.D. Louisiana.

Sept. 23, 1983.

R. James Kellogg, William I. Quigley, Lani Guinier, Stanley A. Halpin, Steven Scheckman, New Orleans, La., Jack Greenberg, New York City, for plaintiffs.

Martin L. C. Feldman, New Orleans, La., David R. Paynter, Baton Rouge, La., for defendant Treen.

William Guste, Jr., Ronald C. Davis, Robert Kutcher, New Orleans, La., Kenneth C. Dejean, Baton Rouge, La., for other defendants.

Before POLITZ, Circuit Judge, and CASSIBRY and COLLINS, District Judges.

MEMORANDUM OPINION

POLITZ, Circuit Judge:

Individually and on behalf of all black persons residing and registered to vote in Louisiana, plaintiffs Barbara Major, Michael Darnell, Bernadine St. Cyr, Brenda Quant and Annie A. Smart brought suit under the Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983, § 2 of the Voting Rights Act, as amended, 42 U.S.C. § 1973, and 28 U.S.C. §§ 2201 and 2202, seeking declaratory and injunctive relief restraining use of the recent realignment of the state's congressional districts, Act 20 of the 1981 First Extraordinary Session of the Louisiana Legislature. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 1973j. The gravamen of plaintiffs' claims is that Act 20 was designed and has the effect of cancelling, minimizing or diluting minority voting strength by dispersing a black population majority in Orleans Parish into two congressional districts. The question posited is whether legislation dividing a highly concentrated black population existing in one geographic and political unit, a parish, into two districts, rather than placing them in a single district in which blacks would constitute a majority, deprives Louisiana's black voters of the right to effective participation in the electoral process.

*Facts and Procedural History*

In November 1981, Act 20 of the Louisiana Legislature's First Extraordinary Session of 1981 apportioned the state into eight single-member congressional districts. Act 1 of that session established new state representative districts. Both enactments were submitted to the Attorney General of the United States for preclearance under § 5 of the Voting Rights Act, 42 U.S.C. § 1973c.[1] Prior to action by the Attorney General, plaintiffs filed the instant suit attacking both plans on statutory and constitutional grounds. The case was assigned to the docket of Judge Robert F. Collins. On June 1, 1982, the Justice Department interposed a § 5 objection to Act 1, rendering that legislation unenforceable. 42 U.S.C. § 1973c.

Judge Collins denied as moot plaintiffs' motion to consolidate their complaint with one filed by a prospective congressional candidate which was later dismissed for want of a justiciable case or controversy. *Robert E. Couhig, Jr. v. James L. Brown, Secretary of State*, 538 F.Supp. 1086 (E.D. La.). Defendants' motion seeking a separate trial of the claims of malapportionment of congressional and state representative districts was granted. Acting on

---

1. Section 5 of the Voting Rights Act of 1965, 42 U.S.C. 1973c, requires a state or political subdivision covered by the Act to obtain preclearance from the Attorney General of the United States or through the District Court for the District of Columbia whenever it adopts or seeks to administer any change in its qualifications, prerequisites, standards, practices or procedures with respect to voting. To receive preclearance, the proposed change must have neither the purpose nor the effect of denying or abridging the right to vote on account of race. The Attorney General's preclearance determination does not pretermit a subsequent action:

 Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, ... shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure.

 42 U.S.C. § 1973c.

 Private plaintiffs are free to mount a *de novo* attack upon a reapportionment plan notwithstanding preclearance. *United States v. East Baton Rouge Parish School Bd.*, 594 F.2d 56, 59 n. 9 (5th Cir.1977). *See Morris v. Gressette*, 432 U.S. 491, 506–07, 97 S.Ct. 2411, 2421, 53 L.Ed.2d 506 (1977) ("Where the discriminatory character of an enactment is not detected upon review of the Attorney General, it can be challenged in traditional constitutional [or statutory] litigation. But it cannot be questioned in a suit seeking judicial review of the Attorney General's [decision]."). Since the statutory standards of review under § 5 differ from those established by amended § 2, Report on S.1992 of the Senate Committee on the Judiciary, S.Rep. No. 97–417, 97th Cong., 2d Sess. (1982) at 68, 138–39, U.S. Code Cong. & Admin.News, p. 177, a grant or denial of preclearance pursuant to § 5 is not dispositive of a § 2 claim. Hence we conclude that the Assistant Attorney General's preclearance determination has no probative value in the instant case.

plaintiffs' uncontested motion for partial summary judgment, Judge Collins declared the 1976 congressional districting plan, Act 697 of the 1976 Louisiana Legislature, unconstitutional because of large population variances among districts when viewed in light of data developed in the 1980 census.

This three-judge court was designated by Chief Judge Charles Clark of the Fifth Circuit Court of Appeals on June 10, 1982. On June 18, 1982, Act 20 was precleared by the Attorney General. After Act 1, as subsequently modified by the Louisiana Legislature, was approved by the Attorney General, plaintiffs amended their complaint to withdraw their challenge to the reapportionment of the Louisiana House of Representatives. In addition, plaintiffs amended their complaint to assert a cause of action under the 1982 amendments to § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973.

By order dated March 7, 1983, this court reaffirmed Judge Collins' invalidation of Act 697. We granted plaintiffs' motion for class certification pursuant to Fed.R.Civ.P. 23(b)(2), designating a class of persons consisting of all black registered voters residing in the State of Louisiana. Finally, we determined that 28 U.S.C. § 2284(a) vested in this court jurisdiction to entertain plaintiffs' statutory and constitutional claims. Trial was held from March 7 through March 10, 1983. Decision was deferred pending briefing and oral argument. Having considered the evidence adduced at trial, together with the pleadings, briefs, and oral argument of counsel, the court enters the following findings of fact and conclusions of law in conformity with Fed.R. Civ.P. 52(a).

## Findings of Fact

Every ten years a reapportionment[2] of existing congressional districts is compelled by Article I, § 2 of the United States Constitution and by Article 3, § 1 of the Louisiana Constitution of 1974. In 1972, Louisiana's eight congressional districts were realigned based on data developed in the 1970 census. At that time the ideal district population was 455,580 persons. While the state remains entitled to eight representatives following the 1980 census, the ideal district population has increased to 525,497 persons.[3]

The issue before us principally involves the New Orleans metropolitan area, which encompasses the parishes of Orleans, Jefferson, St. Tammany, Plaquemines and St. Bernard. The 1980 census figures reveal

**2.** A technical distinction has been drawn between the terms "apportionment" and "reapportionment," on the one hand, and "districting" and "redistricting" on the other:

> ... *apportionment* and *reapportionment* involve the allocation [by Congress] of a finite number of representatives among a fixed number of pre-established areas. *Districting* and *redistricting* ... refer to the processes by which the lines separating legislative districts are drawn [by the states].

Backstrom, Robins and Eller, Issues in Gerrymandering: An Exploratory Measure of Partisan Gerrymandering Applied to Minnesota, 62 Minn.L.Rev. 1121, 1121 n. 1 (1978). *See Carstens v. Lamm*, 543 F.Supp. 68 (D.Col.1982) (three-judge court); R. Morrill, Political Redistricting and Geographic Theory at 2 (1981). To facilitate discussion, however, these terms will be utilized interchangeably.

**3.** The following table sets forth the 1980 population, percentage of black population and percent of deviation in the eight 1972 districts:

Louisiana Congressional Districts
1980 Census

1972 Plan

| District | Population | Black % | Deviation |
|---|---|---|---|
| 1 | 523,271 | 36.5 | − 0.42% |
| 2 | 461,802 | 40.7 | − 12.12% |
| 3 | 571,131 | 14.6 | + 8.68% |
| 4 | 508,593 | 31.9 | − 3.22% |
| 5 | 507,539 | 32.1 | − 3.42% |
| 6 | 577,140 | 29.6 | + 9.83% |
| 7 | 543,235 | 20.1 | + 3.38% |
| 8 | 511,261 | 33.2 | − 2.71% |

Given the near-absolute mathematical precision with which congressional districts must be defined, *Karcher v. Daggett*, —— U.S. ——, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the districts delineated in the 1972 plan fail to satisfy the equal representation standard of Article 1, § 2. *See* Pretrial Stipulation at 4 ("Under the 1980 census, the 1972 apportionment plan for congressional districts was significantly malapportioned, as to all districts except the First....").

pronounced demographic changes in this area.

During the decade of the 1970s, Orleans Parish (coterminous with the City of New Orleans) experienced a marked change and a slight decline in population.[4] While overall population declined, the black population increased. The city/parish now has a black population of 308,039 persons, which constitutes 55% of the total population, 48.93% of the voting age population, and 44.89% of the registered voters. With the exception of affluent white neighborhoods located in the city's Garden District and French Quarter, along the lakefront, and near Tulane and Loyola Universities, the black populace is largely concentrated in one contiguous expanse of the inner city.

By contrast, the predominantly white, suburban parishes of Jefferson and St. Tammany, which flank the central city, have undergone explosive population growth.[5] According to the 1980 census, Jefferson Parish, with a 13.9% black population, a 13.75% black voting age population, and a 10.45% black voter registration, is nearly 87% the size of the ideal congressional district. Unlike Orleans Parish, Jefferson Parish's black population is diffused throughout the parish. Prior to the recent demographic shifts, New Orleans had enough people to form the dominant majority in two congressional districts. Now only 1.06 times the size of the ideal district, as defined by the 1980 census, New Orleans' traditional dominance of two congressional districts is no longer supported by its population.

Under the 1972 redistricting plan, the First Congressional District, presently represented by Robert Livingston, encompassed St. Bernard, Plaquemines and St. Tammany Parishes, together with the lakefront, eastern Mid-City, Algiers and New Orleans east sections of Orleans Parish. An overlay of the 1980 census data to that district, as configured under the 1972 plan, reflects a 36.5% black population and 28.4% black voter registration. The Second Congressional District, presently represented by Lindy Boggs, covers those portions of Jefferson Parish to the south (West Bank) and immediately north (East Bank) of the Mississippi River, as well as New Orleans' central business district, French Quarter, Uptown or Garden District and western Mid-City, all situated within the boundaries of Orleans Parish. Application of the 1980 census data to the 1972 boundaries of the Second District shows that 49.7% of the population and 34% of the registered voters are black. See Exhibit "A" attached.

### Legislative History of Act 20

Early in 1981, members of the Louisiana House and Senate research staffs were instructed to collate the 1980 population data compiled by the United States Bureau of the Census, and to ascertain the extent of malapportionment, if any, under the 1972 plan. With the assistance of the Louisiana State University's Division of Research Services, House and Senate research staffs converted the data thus obtained from a census tract to a political subdivision, or precinct, basis. These validated data, referred to as the Weber data, included population and voter registration figures, and provided the exclusive data base for congressional redistricting in both houses.

Recognizing the need for realignment of the state's congressional districts, the legislature established the Louisiana House and Senate Joint Congressional Reapportionment Committee. In July, at the close of

4.

Orleans Parish

| Census | Population | No. of Ideal Districts |
|---|---|---|
| 1980 | 557,482 | 1.06 |
| 1970 | 593,471 | 1.30 |
| 1960 | 627,525 | 1.54 |
| 1950 | 570,445 | 1.70 |
| 1940 | 494,537 | 1.67 |
| 1930 | 458,762 | 1.75 |

5.

Jefferson Parish

| Census | Population | No. of Ideal Districts |
|---|---|---|
| 1980 | 454,592 | 0.87 |
| 1970 | 338,229 | 0.74 |
| 1960 | 208,769 | 0.51 |
| 1950 | 103,873 | 0.31 |
| 1940 | 50,427 | 0.17 |
| 1930 | 40,032 | 0.15 |

the regular 1981 session, each house appointed legislators to *ad hoc* congressional reapportionment subcommittees functioning under the jurisdiction of two standing committees, the Senate Committee on Senate and Governmental Affairs and the House Committee on House and Governmental Affairs. Senator Thomas H. Hudson chaired the Senate Congressional Reapportionment Subcommittee; Representative John W. Scott chaired its House counterpart. There were four black legislators on the joint committee. No black legislator was appointed to either subcommittee.

■ State-wide public hearings soliciting citizen input were conducted by the subcommittees from July through October 1981. One of the principal issues debated in the various fora concerned the possibility of fashioning a district centered in Orleans Parish, which, as the 1980 census data reflected, had a black population of 55%. Representative Richard Turnley, in his capacity as Chairman of the Louisiana Legislative Black Caucus, testified before the joint reapportionment committee in support of the proposition that the state's minority

constituency would be best served by the structuring of an Orleans Parish-based district which maintained the cohesiveness of the metropolitan black community. Minutes of several public hearings held in August 1981 reveal that other legislators, both white and black, shared this view.[6] Other considerations identified as important to the reapportionment process were compactness, contiguity, respect for parish lines, and a recognition of ethnic, cultural and geographic differences.

Based on the recommendations of legislative counsel, the House subcommittee promulgated several rules for the designing of congressional districts.[7] Embodied in these rules were the principles of strict compliance with the "one-person, one-vote" axiom, allowing for a maximum deviation of only .5%, and the unacceptability of any proposal shown to have either the goal or the effect of diluting minority voting strength. Identical criteria were endorsed by the Senate subcommittee. During the first joint meeting on August 21, 1981, these guidelines were formally adopted.[8]

6. Contending that oral or written statements uttered in the context of public hearings before the joint committee and subcommittees are hearsay, defendants contest the admission of transcripts, or minutes, of these meetings. We disagree, finding that the transcripts fall within the public record exception of the hearsay rule. Fed.R.Evid. 803(8). Under Rule 803(8)(A), the following are not excludable as hearsay, even though the declarant is available as a witness:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency.

Plaintiffs' Exhibits 1 through 9, inclusive, are records of regularly-conducted sessions of a joint committee and subcommittees of the Louisiana Legislature and, as such, are admissible as evidence of the facts to which they relate without foundational testimony. J. Weinstein and M. Berger, 4 *Weinstein's Evidence* ¶ 803(8)[01] (1981). There is no challenge to the authenticity of these records. We have not considered statements presenting double hearsay problems. With this exception, written and oral statements contained in the minutes of the various public hearings are admissible as evidence of the matters asserted.

7. In presenting their proposed redistricting guidelines to the House subcommittee at the

July 23, 1981 public meeting in Baton Rouge, counsel advised members that racial considerations must play a key role in reapportionment, and that minority voting strength could not be dissipated through the fragmentation of significant minority population concentrations. Minutes of July 23, 1981 Public Hearing Before the House and Governmental Affairs Subcommittee, pp. 159–174. David Poynter, Clerk of the House of Representatives, warned that:

> [o]ne concern of the courts is the existence of a predominantly black neighborhood or area with a sufficient amount of population to justify a district where it becomes apparant [sic] that the effect was to carve up that group of people in such a way as to put them in two or three separate districts and make it impossible to elect a black representative. That probably without any question is impermissible. *Id.* at 190.

8. Rule I of the Joint Legislative Committee on Reapportionment Proposed Rules for Congressional Reapportionment, as approved by the Joint Committee on August 21, 1981, stipulates that:

> 1. Equality of population of congressional districts insofar as is practicable is the goal of congressional reapportionment.
> 1.A. Deviations from the "ideal district" population should be justifiable either as a

Several groups submitted proposals to the joint committee or the two subcommittees, among them Governor Dave Treen and the Louisiana congressional delegation.[9] None of the Governor's three proposed plans, denominated Treen A, B, and C, contemplated a majority black district.[10] During this period the Governor publicly expressed his opposition to the concept of a majority black district, stating that districting schemes motivated by racial considerations, however benign, smacked of racism, and in any case were not constitutionally required.

Guided by the joint committee's reapportionment criteria and the views articulated at the public hearings held throughout the summer and fall of 1981, the Senate research staff prepared more than 50 plans. The staff was directed to formulate a plan containing an Orleans Parish-dominated district. Such a district would necessarily have a black majority population. Michael Baer, Secretary of the Senate and the official charged with supervising legislative drafting procedures, ensured compliance with such well-established reapportionment guidelines as one-person, one-vote, compactness, respect for the integrity of geographic boundaries, preservation of communities of interest, and non-retrogression. Partisan political concerns also figured prominently in the confection of the various plans, among them the desires of Jefferson Parish political leaders, including Tax Assessor Lawrence C. Chehardy, for the creation of a district composed primarily of that parish.

To achieve these goals, the Senate staff developed a plan which, as the result of the sponsorship of Senator Samuel B. Nunez, Jr. of St. Bernard Parish, would subsequently be referred to as the "Nunez Plan." See Exhibit "B" attached. As drafted, this plan envisaged one black and seven white population majority districts. Nunez's proposed First Congressional District, 72% of which was made up of Jefferson Parish, combined that area of the parish lying west of the Mississippi River with Orleans Parish's Ward 15, and the parishes of Plaquemines and St. Bernard. The proposed Second Congressional District consisted almost entirely of Orleans Parish (94.9%), together with 25 contiguous precincts drawn from east Jefferson Parish. St. Tammany was restored to the Sixth

---

result of the limitations of census geography, or as a result of the promotion of a constitutionally acceptable rational state policy.

1.B. In order to meet constitutional guidelines for congressional districts, any plan, or proposed amendment thereto should conform to a relative deviation range of one (1%) percentum, or a relative deviation of $+/-$ ½ of one (.5%) percentum.

According to Rule IV, also approved by the Joint Committee:

1. The dilution of minority voting strength is contrary to public policy. The right of meaningful political participation of minority citizens is recognized. Accordingly, any proposed apportionment plan, or amendment thereto, demostrated [sic] to have the objective or consequence of diluting the voting strength of minority citizens is unacceptable.

9. On behalf of all eight of Louisiana's congressional representatives, Congressman William Tauzin presented a proposed reapportionment plan to the joint committee at its August 21 organizational meeting. Several districts within this plan exceeded the population deviation ceiling prescribed by the committee's reapportionment rules. Albeit invited to submit a plan which rectified this deficiency, the delegation as a whole did not do so.

10. Black and white population percentages in the eight congressional districts created by Treen plans A through C are:

% WHITE

| District | Proposal A | Proposal B | Proposal C |
|---|---|---|---|
| 1 | 65.8 | 65.8 | 65.8 |
| 2 | 54.6 | 54.6 | 54.6 |
| 3 | 83.6 | 84.0 | 83.6 |
| 4 | 67.1 | 66.7 | 67.1 |
| 5 | 67.5 | 67.5 | 67.5 |
| 6 | 70.1 | 70.1 | 70.1 |
| 7 | 77.7 | 76.7 | 71.0 |
| 8 | 67.6 | 68.5 | 74.3 |

% BLACK

| District | Proposal A | Proposal B | Proposal C |
|---|---|---|---|
| 1 | 32.0 | 32.0 | 32.0 |
| 2 | 43.5 | 43.5 | 43.5 |
| 3 | 14.3 | 13.8 | 14.3 |
| 4 | 31.6 | 32.0 | 31.6 |
| 5 | 31.9 | 31.9 | 31.9 |
| 6 | 28.8 | 28.8 | 28.8 |
| 7 | 21.5 | 22.7 | 28.3 |
| 8 | 31.8 | 30.6 | 24.9 |

Congressional District, from which it had been excised during the 1960s. By allocating separate districts to majority black, urban Orleans Parish and virtually all-white residential Jefferson Parish, Nunez took into account the divergent, frequently antithetical, concerns of city and suburban dwellers, as well as parish lines and the natural geographic barrier erected by the Mississippi River. Utilizing 1980 census figures, Nunez's Second District would be 54% black in population and 43% black in voter registration. The First District would have a black population of 17.9% and a black voter registration of 12%.[11]

On the House side, the legislative staff devised a plan which largely adhered to parish lines and left intact the concentration of blacks residing in Orleans Parish. Named for its sponsor, Representative Scott, this plan envisioned a 50.2% black population majority and 44% black registered voter population in the Second Congressional District, and a 22.5% black population and 17% black registered voter population in the First District.

Governor Treen summoned the legislature into extraordinary session on November 2, 1981 for the purpose, *inter alia*, of legislative and congressional reapportionment. Various bills to reapportion the eight congressional districts were filed on the first day of the session, among them the Nunez Plan, introduced in the Senate by Senators Nunez and Tiemann as S.B. 5, and the Scott Plan, introduced in the House by Representative Scott as H.B. 2. Of all bills referred to the standing Senate and House committees on governmental affairs, only S.B. 5 and H.B. 2 received favorable committee action.

Members of the Louisiana Black Caucus united with the Jefferson Parish forces, led by Nunez and Chehardy, in urging passage of the Nunez Plan. That Nunez and Chehardy were principally concerned with establishing a district controlled by predominantly white Jefferson Parish was of little import to black legislators, who advocated the plan's concomitant formation of a majority black district in Orleans Parish. On November 4, 1981, S.B. 5 was reported out of committee with minor substantive amendments and onto the Senate floor, where it was passed by a vote of 31 to 6. A move to amend S.B. 5 to substitute Governor Treen's Plan A was defeated, and S.B. 5 was sent to the House for further action.

H.B. 2 was simultaneously reported out of House committee and placed on the House calendar on November 4, 1981, along with an amendment to substitute Governor Treen's Plan B for the Scott Plan. The House Committee on House and Governmental Affairs received S.B. 5 on November 5, 1981, but declined to amend H.B. 2 to adopt the Senate bill. Representative Charles Bruneau, a member of the committee, testified that his vote in committee against S.B. 5 resulted from the plan's abandonment of urban New Orleans' 130-year tradition of electing two congressmen.

In proceedings before the full House on Friday, November 6, the representatives declined to amend H.B. 2 to substitute Treen Plan B. Despite the Committee on House and Governmental Affairs' previous rejection of S.B. 5, the House then voted 61 to 38 to adopt the Nunez Plan by engrafting it on H.B. 2 and dispatched the newly-amended H.B. 2 to the Senate. Some of the 38 negative votes stemmed from the perception that New Orleans would "lose" control of a seat under the Nunez Plan.[12]

11. The population deviations and percentages of black population and voter registration for each of the eight congressional districts formed by the Nunez Plan are:

| Dist. | Total Pop. | % Deviation | % Black Pop. | % Black Reg. Voters |
|---|---|---|---|---|
| 1 | 526,666 | 0.22 | 17.9 | 13.0 |
| 2 | 525,135 | − 0.07 | 54.0 | 43.5 |
| 3 | 525,581 | 0.02 | 21.3 | 18.8 |
| 4 | 525,067 | − 0.08 | 31.6 | 22.3 |
| 5 | 525,656 | 0.04 | 31.1 | 24.5 |
| 6 | 525,074 | − 0.08 | 22.8 | 17.5 |
| 7 | 523,847 | − 0.31 | 20.0 | 16.8 |
| 8 | 524,953 | − 0.11 | 36.9 | 30.3 |

12. Regardless of the sincerity with which it is held, the legislators' conviction is no longer val-

Also cited was the antagonism of a number of legislators toward the drawing of a district whose racial composition would facilitate the election of a black congressman. Representative Mary Landrieu testified:

> There were people that supported that plan [Nunez Plan], like myself, because we wanted to be aggressive and pushing for a black district or a district where minority voting strength would be encouraged. And so there were people on the opposite side who didn't feel they wanted to have a district that would be able to elect a black representative.

Record, Vol. III at 49.

Both houses of the Louisiana Legislature had thus approved reapportionment bills incorporating the Nunez Plan in its entirety, although the House Bill inadvertently left out one precinct. Upon learning of the action of the legislature, Governor Treen announced his intention to veto the Nunez Plan if finally passed.[13]

Proponents of the Nunez Plan were keenly aware of the implications of the Governor's promised veto. Louisiana's chief executive has considerable power and influence, both *de jure* and *de facto*. Testimony reflects that the Louisiana Legislature has never overridden a gubernatorial veto. A sufficient number of legislators changed their position in response to the threatened veto to assure the demise of the Nunez Plan.

Because of his decisive role in the defeat of the Nunez Plan after it had received the overwhelming support of both houses of the legislature, Governor Treen's stated reasons for acting are relevant. At trial, the Governor outlined the considerations which prompted his objection to the Nunez Plan. He described as unfair the submergence of St. Bernard and Plaquemines Parishes under Jefferson Parish, albeit acknowledging that the populations of these two coastal parishes would constitute only a minor portion of any district. The Governor also wished to maintain existing district configurations where possible, protect the incumbent, Livingston, and retain Orleans' traditional influence in the selection of two representatives.

Another concern of the Governor related to racial polarization, which he perceived to be an inevitable consequence of the deliberate sculpting of districts along racial lines. He denounced any legislative scheme which intentionally drew boundary lines so as to consolidate a majority of one race within a single district. He specifically rejected the Nunez Plan, which would create a 55% black district, for this reason. In the state's § 5 submission to the Justice Department, prepared by counsel and approved by the Governor, this plan was characterized as an attempt by the Louisiana Legislature to enact into law the discredited idea of proportional representation.

These concerns were restricted to the aggregation of blacks within one district; the coalescence of whites was not regarded as ominous so long as Congressman Livingston's chances for re-election were maximized. An Orleans-based district with a 55% black population was not acceptable to the Governor. As later noted, an Orleans-based district with a 55% white population encountered no objection.

---

id. The population of Orleans Parish, the region's nodal center, has historically been large enough to control two congressional districts. Given the loss of approximately 36,000 people over the last decade, and the concomitant increase in the ideal district population of approximately 70,000 people, Orleans Parish's population is now only 1.06 times larger than the ideal district required by the 1980 census data. *See* p. 329, *supra.*

**13.** According to Article 3, §§ 17 and 18 of the Louisiana Constitution of 1974, a bill has the force and effect of law only if passed by both houses of the legislature and delivered to the governor within three days of passage with the signatures of the presiding officers, and the governor either signs it or fails to sign or veto it within ten days after delivery if the legislature is in session, or within 20 days if adjourned. Hence the legislature has no authority "to create congressional districts independently of the participation of the Governor as required by the state constitution with respect to the enactment of laws." *Smiley v. Holm,* 285 U.S. 355, 373, 52 S.Ct. 397, 401, 76 L.Ed. 795 (1932).

The court finds that the Governor's opposition to the Nunez Plan was predicated in significant part on its delineation of a majority black district centered in Orleans Parish.

On the morning of November 9, 1981, the Governor announced his Reconciliation Plan, cognomened Treen Plan X. Substantially similar to the alternatives previously rejected by the legislature, Plan X provided for eight majority white districts.[14] That afternoon the House reversed its position on the Nunez Plan and, by a vote of 79 to 22, substituted the Reconciliation Plan as the text of S.B. 5. As thus amended, S.B. 5 was returned to the Senate and was there soundly rejected, throwing the matter into conference committee.

Appointment of a conference committee was deferred until a compromise acceptable to the Governor could be fashioned. Senate President Michael O'Keefe of New Orleans summoned "interested" parties to a private meeting in the Senate Computer Room, situated in the sub-basement of the State Capitol. Present at varying times were Senators Nunez, O'Keefe and "Hank" Lauricella of Jefferson Parish, Assessor Chehardy, Jefferson Parish Representative John Alario, Louisiana A.F.L.–C.I.O. President Victor Bussie, Congressman Gillis Long, congressional aides to Boggs, Long and Tauzin, and members of the Senate administrative staff. Black legislators were not invited, those responsible for calling the gathering having decided that the goal of crafting a district with a high minority profile would have to be abandoned.

A plethora of factors was considered at the meeting. Nunez and Chehardy vigorously urged a district dominated by Jefferson Parish. Treen Plan X, which split the parish three ways, was discarded at the outset of discussions. Also stressed was the necessity of fulfilling the Governor's objective of guaranteeing the re-election of Congressman Livingston by adding enough white suburban voters to the First District to offset the impact of inner city blacks votes, as well as the desire of several congressmen and state representatives to solidify incumbent Boggs' electoral base by drawing a district as favorable as possible for her. An obvious consideration was the concentration of blacks in New Orleans and the racial composition of the Second District. Albeit resolved to avert any retrogression of the approximately 40% black population in this district, as configured under the 1972 plan, the goal of fashioning a district which was at least 55% Jefferson Parish militated against raising substantially the black population percentage of that district. Hence the participants determined that the minority's interest in obtaining a predominantly black district would have to be sacrificed in order to satisfy both the Governor and the Jefferson Parish group. As Chehardy candidly explained:

> ... the feeling in the meeting was that the one group, the one contingency group that was not going to come out of the session satisfied was going to be the blacks. The reason for that was that with all of the competing interests ... there was probably going to be virtually no way to satisfy the black members of the Legislature ... insofar as creating a majority black district [was concerned].... They [minority legislators] didn't have enough votes.

Record, Vol. III at 28.

Working late into the evening, the sub-basement conferees ultimately arrived at that synthesis of conflicting interests incorporated into Act 20. See Exhibit "C" attached. Jefferson Parish constitutes approximately 55% of the Second District under the Act; portions of Orleans Parish make up the remainder. St. Tammany, St. Bernard and Plaquemines parishes, togeth-

---

14. Under Treen Plan X, total population and black and white population percentages for each of the eight districts are:

| District | Total Population | % White | % Black |
|---|---|---|---|
| 1 | 525,669 | 68.86 | 28.87 |
| 2 | 525,885 | 53.36 | 44.75 |
| 3 | 526,734 | 82.30 | 15.63 |
| 4 | 525,067 | 67.05 | 31.61 |
| 5 | 525,668 | 68.25 | 31.16 |
| 6 | 524,738 | 73.00 | 25.90 |
| 7 | 525,186 | 79.17 | 20.09 |
| 8 | 525,025 | 61.96 | 37.47 |

er with the lakefront, New Orleans east, and Algiers sections of Orleans Parish, are placed within the First District. The jagged line dividing the First and Second Districts commences in the east below the west bank of the Mississippi River, casting Ward 15 and Plaquemines Parish into District One. Traversing the Mississippi, the line runs north for approximately 15 blocks and juts sharply to the east to sever the southern extremities of Wards 8 and 9, gathering predominantly white neighborhoods within District One. Veering north through the midsection of Ward 9, then west through Wards 9, 7, and 8, the line sweeps the densely-populated black community of central New Orleans into District Two, and the adjoining white neighborhoods which border Lake Ponchartrain into District One. Moving south and west, the line fractures Wards 5, 4, 3, and 2 to separate white and black areas into Districts One and Two, respectively. Ward 14, which is 90% white, is aligned within District One. Tracing a northwesterly path along the east bank of the Mississippi, the line extends north to dissect a discrete black concentration on Carrolton, joining one part with an expanse of white population in Jefferson Parish. The total population, percent deviation from the ideal population, percent black population and percent black registered voters for each district created by Act 20 are as follows:

| Dist. | Total Pop. | % Deviation | % Black Pop. | % Black Reg. Voters |
|---|---|---|---|---|
| 1 | 525,319 | − 0.03 | 29.5 | 21.5 |
| 2 | 526,605 | 0.21 | 44.5 | 38.7 |
| 3 | 526,364 | 0.17 | 15.2 | 12.7 |
| 4 | 525,067 | − 0.08 | 31.6 | 22.3 |
| 5 | 525,668 | 0.03 | 31.2 | 24.6 |
| 6 | 524,374 | − 0.21 | 25.1 | 18.1 |
| 7 | 525,186 | − 0.06 | 20.1 | 16.9 |
| 8 | 525,389 | − 0.02 | 38.3 | 21.9 |

District boundaries fixed by Act 20 are clearly racial in character, selectively segregating white and black residents of New Orleans into the majority white First District and the more heterogeneous Second District. When traced on a map of the city, that portion of the Second District which cuts into Orleans Parish resembles the head of a duck, with the bill splintering Ward 9, a contiguous black community of approximately 94,000 people. Ward 8, which also contains a high concentration of blacks, was sliced three ways, with the extreme northern (lakefront) and southern segments assigned to District One and the midsection to District Two. Although other black wards are fragmented, the integrity of predominantly white wards is assured. Of the 31 metropolitan precincts with a black population of 95% or higher, most of which are situated precisely on the duck bill, 17 were placed in District One and 14 were placed in District Two. Act 20's racial boundary line separates cohesive black neighborhoods in the inner city which share common political and socio-economic interests premised on income, transportation, education and housing. Similar disruption of white neighborhoods is minimal.

Senate Secretary Baer, who with Senate staff member Nancy Barringer was charged with producing a plan reconciling the disparate interests of the sub-basement conferees, candidly testified that neutral apportionment guidelines heretofore applied in drafting the Nunez Plan were jettisoned in the effort to attain a compromise.[15] Districts One and Two of Act 20,

15. It is important to emphasize that our comparison of the effects of the Nunez Plan and Act 20 intimates no view of the former as the final expression of state redistricting policy. Both the Governor and the legislature are integral components of the legislative process; thus any

with their distorted shapes and irregular, indented perimeters, are not geographically compact. These unusual configurations are not necessary to ensure adherence to the one-person, one-vote rubric. In contrast to the Nunez Plan, Act 20 deviates from the natural geographic barrier formed by the Mississippi River, which separates an enclave of inner city blacks from whites residing in suburban areas.

New Orleans' traditional political subunit, the ward,[16] has been selectively fragmented by Act 20. Black population concentrations within most of the nine Orleans Parish wards split by the Act have been disrupted, whereas white concentrations remain essentially inviolate. Not a single ward is divided under the Nunez Plan.

By disregarding parish lines and uniting populated segments of Orleans and Jeffer-

son Parishes with mutually exclusive, often discordant needs and concerns, Act 20 effectively ignores both historic boundaries and obvious communities of interest. Since Jefferson Parish comprises the majority of Act 20's Second District, the interests of the more conservative, suburban white populace have effectively eclipsed those of the less conservative, urban blacks who make up only 17.9% of the district's population.

Once completed, the new plan was submitted to Governor Treen for review. After the Governor accepted the plan on November 11, 1981, Senators Hudson, Nunez and O'Keefe, and Representatives Scott, Bruneau and Alario were appointed to a formal conference committee. None of these individuals is black.

A public meeting was convened by the committee for the purpose of preparing a

plan that does not survive this process to become law must be regarded as "proffered current policy" which, though entitled to thoughtful consideration, cannot be deemed a clear articulation of established state goals. *See Sixty-Seventh Minnesota State Senate v. Beens,* 406 U.S. 187, 92 S.Ct. 1477, 32 L.Ed.2d 1 (1972); *Carstens v. Lamm,* 543 F.Supp. 68 (D.Colo.1982); *Shayer v. Kirkpatrick,* 541 F.Supp. 922 (W.D.Mo.1982) (three-judge court); *O'Sullivan v. Brier,* 540 F.Supp. 1200 (D.Kan.1982) (three-judge court). Courts have nonetheless recognized that the farther a bill progresses in the legislature, the more probative it is of a discrete state policy. *Shayer v. Kirkpatrick; Skolnick v. State Electoral Board,* 336 F.Supp. 839 (N.D.Ill.1971) (three-judge court). Having so observed we note that the first article of the Louisiana Civil Code declares: "Law is a solemn expression of legislative will."

**16.** Judge John Minor Wisdom described the origin and political significance of the ward in *Taylor v. McKeithen,* 499 F.2d 893 (5th Cir. 1974):

A ward in New Orleans traditionally means as much to its residents as a parish or county does to its residents. The City has been divided into wards since 1805, and most of the ward boundaries are far more ancient than any question of Negro voting strength.

　　＊　　＊　　＊　　＊　　＊　　＊

The direct ancestor of the present ward structure was adopted in 1852. Ward boundaries have been changed since then only by the addition of new wards to accommodate areas newly incorporated into the city, except for a minor change in 1878 to correct an

anomaly and a major change in 1880 when a substantial area was taken from the sixth ward and added to the fourth and fifth. The change of 1880 was the last change in the ward boundaries to date. The Home Rule Charter of the City for 1954 has the same ward boundaries as its predecessor, the charter of 1912.

　　＊　　＊　　＊　　＊　　＊　　＊

The first function of the wards was to serve as the districts from which were elected the aldermen who formed the governing council of the City. Since then, they have been used as the basic units of apportionment for representatives in the United States Congress, for presidential electors, for state senators and representatives, for judges and lesser officials of the city courts, for city councilmen, for tax assessors, and for the members of the numerous central or regional committees which form the statutory structure of the political parties. The wards have structured working levels of political organizations. Parties and factions have generally been organized along ward lines with ward leaders as major political powers.

Moreover, the wards are real and important parts of the city's life and culture. Residents of the City are likely to speak of themselves as living in the Twelfth Ward, or the Seventh, or the Fourteenth, say in contexts quite apart from politics; indeed, in the same way that one would say that he lived in Marigny or in the Irish Channel or the lower Garden District.

*Id.* at 904–05 (footnotes omitted). Evidence adduced at trial confirmed Judge Wisdom's assessment of the New Orleans political scene.

conference report on proposed Act 20. Representatives Diana Bajoie, John Jackson, Alphonse Jackson and Henry Braden, members of the Legislative Black Caucus, voiced strenuous objection to the compromise plan, all arguing that a majority black district encompassing Orleans Parish was necessary to enable minority voters to elect a representative of their choice. The testimony of Representative Turnley and New Orleans Mayor Ernest N. Morial, both black, illustrates that the consensus of opinion among the state's minority leaders was that Act 20 was inimical to the interests of Louisiana's black constituency. Following an abortive attempt by Representative Scott to amend S.B. 5 to expand the Second District's black population to 50.2%, the compromise provision was adopted by the committee by a vote of 4 to 2, with Representatives Scott and Alario dissenting.

On November 12, 1981, the House and Senate adopted the conference committee report. Governor Treen signed this bill into law on November 19, 1981, and it became Act 20 of the First Extraordinary Session of 1981.

## Voting Patterns and Polarization

There is a substantial degree of racial polarization exhibited in the voting patterns of Orleans Parish. By inserting the 1980 census data in a computerized, stepwise regression program, Dr. Gordon Henderson, plaintiffs' expert, empirically measured the extent of racial bloc voting in 39 Orleans Parish elections between the years 1976–82. This program first employed a regression equation to predict the number of votes cast for a black candidate by registered black voters in a specific precinct. Another statistical tool, a Pearson correlation coefficient, was then used to examine all conceivable relationships between a single dependent variable, votes in favor of a black candidate, and several independent variables, *inter alia*, the number of black registered voters and total population per precinct, in order to isolate the one variable which most accurately explained why those votes were received. The coefficients derived by plaintiffs' expert demonstrate an almost perfect correlation between a candidate's race and that of the voters who manifested a preference for his or her candidacy at the ballot box.[17]

17. For each of the 39 elections studied, the correlation coefficient, or statistical measure of the strength of the relationship between the votes received by black candidates and the number of black registered voters, white registered voters or white persons, coupled with the number of precincts from which data were obtained, were listed by Dr. Henderson as follows:

| Date | Office | Black Reg. Voters | White Pop. | No. of Pcts. |
|---|---|---|---|---|
| 8/3/79 | Judge, District H | .87 | –.40 | 426 |
| 4/7/79 | Judge, District H | .89 | –.44 | 426 |
| 10/27/79 | Judge, Section E | .94 | –.41 | 426 |
| 10/27/79 | Judge, Section C | .65 | –.04 | 392 |
| 12/8/79 | State Senate, 6th Dist. | .94 | –.73 | 61 |
| 12/8/79 | Judge, Section E | .84 | –.22 | 426 |
| 4/4/81 | Councilman "D" | .92 | –.69 | 86 |
| 5/16/81 | Councilman "D" | .90 | –.68 | 86 |
| 10/17/81 | Judge, Section C | .87 | –.40 | 392 |
| 10/1/77 | Mayor | .95 | –.45 | 426 |
| 10/1/77 | Councilman-at-Large | .93 | –.42 | 426 |
| 10/1/77 | Councilman "B" | .80 | –.45 | 78 |
| 10/1/77 | Clerk, Crim. Dist. Ct. | .67 | .00 | 426 |
| 4/30/77 | Assessor, 4th Dist. | .94 | –.72 | 31 |
| 4/5/80 | B.E.S.E., 2nd Dist. | .51 | –.17 | 194 |
| 5/17/80 | B.E.S.E., 2nd Dist. | .62 | –.31 | 194 |
| 9/13/80 | School Board | .89 | –.31 | 426 |
| 9/13/80 | Judge, Section A | .91 | –.45 | 392 |
| 8/4/78 | State Senate, 4th Dist. | .82 | –.63 | 60 |
| 9/16/78 | Magistrate Judge | .90 | –.39 | 426 |
| 9/16/78 | Judge, Section B | .90 | –.46 | 426 |
| 11/7/78 | School Board | .90 | –.40 | 426 |

Plaintiffs' quantitative showing of polarization was buttressed by the testimony of trained political observers. Mayor Morial, now in his second term, has been actively involved in politics at the state and local levels since his election to the legislature in 1967. He has been elected to positions in all three branches of government. Mayor Morial opined that racial bloc voting is prevalent in Orleans Parish. On the basis of a study of the literature relative to 18 elections conducted in Orleans Parish from 1960 to 1976, Dr. Richard Engstrom, a professor of political science at the University of New Orleans, found substantial evidence of voting along racial lines. With reference to the 1977 mayoral contest in which Mayor Morial prevailed, Dr. Engstrom opined that the New Orleans metropolitan area was gradually becoming more polarized. Defense expert Dr. John Wildgen

postulated, in a published study, that racial polarization determined the outcome in New Orleans school board elections.

One explanation for the perceptible growth of racial polarization over the last 15 years, proffered by plaintiffs' expert Dr. Ralph Cassimere, a professor of history at the University of New Orleans, is that as blacks have begun to gain access to elective office, white voters have rallied in increasing numbers to vote for candidates of their race. A lower margin of victory for black incumbents evinces a greater reluctance on the part of white voters to vote for a black. As Dr. Cassimere observed:

... polarity is much more pronounced among whites in voting for black candidates. Black [voters] ... traditionally have voted for white candidates. I think

| Date | Office | Black Reg. Voters | White Pop. | No. of Pcts. |
|---|---|---|---|---|
| 8/14/76 | Judge, Section C | .90 | −.51 | 426 |
| 8/14/76 | School Board | .88 | −.50 | 426 |
| 10/2/76 | Councilman-at-Large | .87 | −.44 | 426 |
| 10/2/76 | Councilman "B" | .88 | −.56 | 78 |
| 11/2/76 | School Board | .80 | −.27 | 426 |
| 11/4/80 | School Board | .66 | .10 | 426 |
| 4/1/78 | State Senate, 4th Dist. | .95 | −.74 | 60 |
| 11/4/80 | Judge, Section A | .97 | −.39 | 392 |
| | | White Reg. Voters | | |
| 2/6/82 | Civil Sheriff | .83 | −.28 | 428 |
| 3/20/82 | Civil Sheriff | .90 | −.32 | 428 |
| 2/6/82 | Mayor | .97 | −.54 | 428 |
| 3/20/82 | Mayor | .98 | −.54 | 428 |
| 2/6/82 | Judge, Section I | .92 | −.56 | 428 |
| 3/20/82 | Judge, Section I | .96 | −.48 | 428 |
| 2/6/82 | Councilman-at-Large | .80 | −.14 | 428 |
| 2/6/82 | Councilman "B" | .86 | −.45 | 90 |
| 2/6/82 | Councilman "D" | .74 | −.35 | 91 |

According to Dr. Henderson, the range of a Pearson correlation coefficient, also known as a Pearsonian product moment correlation coefficient, is from −1.0 through 0 to +1.0. Coefficients of −1.0 and +1.0 indicate a perfect relationship between two variables. In other words, a value of −1.0 or +1.0 enables a statistician to perfectly predict one variable if he or she knows the value of the other. Coefficients of ±.5 and higher are deemed statistically significant. Values of .7 or higher are extremely rare, and attest to a strong correlation between

two variables. A coefficient with a value at or near 0, on the other hand, evidences a weak relationship. *See generally,* D. Baldus and J. Cole, Statistical Proof of Discrimination § 5.321 (1980); N. Nie, C. Hull, J. Jenkins, K. Steinbrenner and D. Bent, SPSS: Statistical Package for Social Sciences at 279–80 (2d 1975).

The 39 coefficients calculated by Dr. Henderson range from +.51 to +.95, indicating that a candidate's race was the single variable most predictive of the number of votes received by that candidate.

there is some feeling of illegitimacy about black candidates.

Record, Vol. II at 119.

In an effort to rebut plaintiffs' evidence of polarization, defendants introduced a statistical analysis of white cross-over voting in three recent New Orleans elections. This analysis, prepared by demographics expert Kenneth Selle, sampled returns from 37 all-white or black precincts and purported to demonstrate that race had no effect on the results of city-wide elections. Mr. Selle's use of an arbitrary, rather than the preferred random method to select test precincts severely biases the results of his analysis. The units chosen are not representative of the 400 or more precincts in New Orleans, and hence are not sufficiently predictive of voting patterns in the city at large. Some of the precincts culled were racially heterogeneous. Since it is impossible to ascertain, solely from the returns of a mixed precinct, whether individuals who voted for a particular candidate are black or white, data drawn from such precincts are of scant probative value. For these reasons, the court attaches little weight to defendants' cross-over analysis.

Assuming, *arguendo*, that defendants had established the existence of a significant white cross-over vote in Orleans Parish, the court remains persuaded that racial polarization plays a significant role in the electoral process. The evidence shows that only those affluent, better-educated whites residing in the city's French Quarter and university districts are inclined to vote for a black candidate. This liberal, white constituency is unique to Orleans Parish. Similarly eclectic voting preferences cannot be anticipated in the adjacent suburban parishes, whose recently enhanced populations can be partially ascribed to the exodus from New Orleans of white families seeking to avoid court-ordered desegregation of the city's public schools.

Nor does the fact that several blacks have gained elective office in Orleans Parish detract from plaintiffs' showing of an overall pattern of polarization. To the contrary, Mayor Morial attributes his victory in the 1982 mayoral race to his success in marshalling the black vote. Of the approximately 70 Orleans Parish officials elected throughout the parish, only 15% are black. A greater number of minority officeholders would be expected in a parish with a black population of 55%.

According to the expert testimony, Louisiana's majority vote requirement, which ordains that a winning candidate must receive more than half the votes cast in an election, inhibits political participation by black candidates and voters in a racially polarized environment. Racial bloc voting, in the context of an electoral structure wherein the number of votes needed for election exceeds the number of black voters, substantially diminishes the opportunity for black voters to elect the candidate of their choice. Mr. Selle testified that in Louisiana a threshold black/white population ratio of 62/38 is a prerequisite to the creation of a "safe" minority district, or one in which the election of the candidate preferred by black voters is guaranteed. Conversely, a 50/50 ratio of black to white population gives rise to a safe white district.[18]

### Discrimination: Past and Present

Louisiana's history of racial discrimination, both *de jure* and *de facto*, continues to have an adverse effect on the ability of its black residents to participate fully in the

---

18. Demographic studies prepared by Mr. Selle were offered to show projected racial population growth between the 1980 and 1990 censuses. Through these studies, defendants sought to prove a future increase in the black population percentage in Act 20's Second Congressional District of close to 6.7% and, in the First District, of 1.5%. Given Mr. Selle's failure to distinguish blacks from a significant number of ethnic and racial groups subsumed within the Census Bureau's non-white category, and to ap-

ply his methodology in a consistent manner to all parishes within the targeted districts, the court finds these data highly suspect and inadequate to prove that the Second District's black population percentage will increase significantly under the present Act. *See Kirkpatrick v. Preisler*, 394 U.S. 526, 535, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519 (1969) ("[f]indings as to population trends must be thoroughly documented and applied throughout the State in a systematic, not an *ad hoc*, manner.").

electoral process. Dr. Ralph Cassimere traced that history to its genesis during the era of slavery, when the franchise was conferred exclusively upon white males. With the advent of post-Civil War Reconstruction, black males were permitted to register. Between 1868 and 1896 many black state legislators were elected. Two blacks were elected Lieutenant Governor and one, P.B.S. Pinchback, was selected by the state Senate to fill a vacancy in that position and later served as Acting Governor. Pinchback subsequently was selected to serve in the United States Senate but was not seated. Three blacks claimed seats in the United States House of Representatives but only one, Charles E. Nash, was seated. Charles Vincent, *Black Legislators in Louisiana During Reconstruction.* Although black suffrage flourished from 1867 to 1898, a gradual return to white supremacy culminated in the Louisiana Constitution of 1898. At that time, the state succeeded in imposing a "grandfather" clause, as well as educational and property qualifications for registration. These requirements combined to reduce black voter registration from approximately 135,000 in 1896 to less than 1,000 in 1907.

Following the Supreme Court's invalidation of the grandfather clause in 1915,

*Guinn v. United States,* 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915), voters were subject to an "understanding" clause which hindered black registration. Poll taxes were levied, and registration rolls purged. In 1923, the state authorized an all-white Democratic primary which functioned to deny blacks access to the determinative elections, inasmuch as Republican opposition to the Democratic party in the general elections was nonexistent. This strategem persisted until its condemnation in *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). Citizenship tests and a prohibition against anti-single shot voting were instituted in the 1950s. As a further obstacle to minority access, the legislature established a majority-vote requirement for election to party committees in 1959. For a quarter of a century, from 1940 to 1964, the States Rights Party spearheaded a strong movement against black enfranchisement and judicially-directed desegregation. But for those declared unconstitutional by the Supreme Court, the various disenfranchisement techniques implemented by the state and its white majority parties suppressed black political involvement until banned by Congress in 1965.[19]

Like other southern states, Louisiana enforced a policy of racial segregation in public education, transportation and accommo-

---

**19.** Statistics demonstrating the extent of black disenfranchisement between 1910 and October 1964, inclusive, have been compiled in Louisiana Politics at 299 (Bolner, ed. 1980):

Black Voter Registration in Louisiana,
1910–1964

| Dates | Black Reg. | Est. Black Adult Pop. (Most Recent Census) | % Black Adult Pop. Reg. to Vote |
|---|---|---|---|
| 1910 | 730 | 174,211 (Males) | .4 |
| 1920 | 3,533 | 359,251 | .9 |
| 1928 | 2,054 | 359,251 | .5 |
| 1932 | 1,591 | 415,047 | .3 |
| Oct., 1936 | 1,981 | 415,047 | .4 |
| Oct., 1940 | 886 | 473,562 | .1 |
| Oct., 1944 | 1,672 | 473,562 | .3 |
| Oct., 1948 | 28,177 | 473,562 | 5 |
| Oct., 1952 | 107,844 | 481,284 | 22 |
| July, 1954 | 112,789 | 481,284 | 23 |
| Oct., 1956 | 152,578 | 481,284 | 31 |
| Dec., 1960 | 158,765 | 514,589 | 30 |
| Dec., 1962 | 150,878 | 514,589 | 29 |
| Oct., 1964 | 164,717 | 514,589 | 32 |

dations. Despite the Supreme Court's ruling in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), local school boards refused to desegregate in the absence of a federal court order. Even today, the federal courts are compelled to monitor schools around the state for compliance with *Brown*'s teachings. A dual university system was operated by the state until 1981, when it was dismantled pursuant to a consent decree. Public facilities were not open to members of both races until the late 1960s.

As a consequence of this history, separate white and black societies developed in Orleans Parish. Segregation was the norm in the private sector, as reflected in the parish's monochromatic neighborhoods, churches, businesses and clubs. Discrimination in employment was widespread.

While direct impediments to black registration and voting have been eradicated, the residual effects of past discrimination still impede blacks from registering, voting or seeking elective office in Orleans Parish. No black has been elected to statewide office in Louisiana in this century, nor has any served in Congress since the days of Reconstruction. Notwithstanding a black population of 29.4%, only 7% of Louisiana's elected officials are black. Current census figures disclose that blacks on the average earn less than whites; 95% of all persons with an income of less than $5,000 are

black. Blacks in contemporary Louisiana have less education, subsist under poorer living conditions and in general occupy a lower socio-economic status than whites. Though frequently more subtle, employment discrimination endures. These factors are the legacy of historical discrimination in the areas of education, employment and housing. Such influences, in conjunction with past election practices excluding blacks from the political process, account for the present disparity between black voter registration and black population in Orleans Parish. From the evidence adduced, we are persuaded that they account for the lower black turnout at election time. A sense of futility engendered by the pervasiveness of prior discrimination, both public and private, is perceived as discouraging blacks from entering into the governmental process.

## Conclusions of Law

 Invoking its authority to enforce the substantive provisions of the Fourteenth and Fifteenth Amendments, Congress recently amended § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (1982).[20] Specifically designed to reach claims of voting dilution heretofore deemed beyond the ambit of § 2, Report on S.1992 of the Senate Committee on the Judiciary, S.Rep. No. 97–417, 97th Cong., 2d Sess. 28 (1982); *Rybicki v. State Board of Elec-*

---

**20.** H.R.3112, amending § 2 to incorporate a "results" test and extend the 1965 Voting Rights Act, was passed by the House on October 15, 1981. The Senate adopted the version of § 2 reported out of the Senate Committee on the Judiciary, S.1992, on June 18, 1982. On June 23, 1982, the House unanimously adopted the Senate bill. As signed into law by the President on June 29, 1982, amended § 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in § 4(f)(2) [42 U.S.C. § 1973(f)(2)], as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to

nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

We are persuaded that Congress intended the 1982 amendments to take effect immediately, and thus to apply to pending cases. *See* 128 Cong.Rec. H3841 (daily ed. June 23, 1982) (remarks of Rep. Sensenbrenner); *id.* at S7095 (daily ed. June 18, 1982) (remarks of Sen. Kennedy, majority floor manager of S.1992). *Ac-*

*tions,* 574 F.Supp. 1082 (N.D.Ill.1983) (three-judge court),[21] the 1982 amendment dispenses with the requirement that a plaintiff demonstrate intentional discrimination in the imposition or maintenance of the disputed electoral structure. S.Rep. No. 97–417 at 16. *See Buchanan v. City of Jackson,* 708 F.2d 1066 (6th Cir.1983); *Campbell v. Gadsen County School Board,* 691 F.2d 978 (11th Cir.1982); *Mc-Millan v. Escambia County,* 688 F.2d 960 (5th Cir.1982), *jurisd. postponed,* —— U.S.

——, 103 S.Ct. 1766, 76 L.Ed.2d 341 (1983). Guided by the axiom that cases should be resolved, where possible, on statutory rather than constitutional grounds, we shall analyze plaintiffs' dilution claim under the amended § 2.[22]

## A. Constitutionality of Amended Section 2.

■ Before proceeding to the merits of plaintiffs' dilution claim, we must address

---

*cord,* Hartman, Racial Vote Dilution and Separation of Powers: An Exploration of the Conflict Between the Judicial "Intent" and the Legislative "Results" Standards, 50 Geo.Wash.L.Rev. 689, 725 (1982). Several dilution actions initiated prior to June 29, 1982, the effective date of the amendments, have been disposed of pursuant to amended § 2. *See, e.g., Rybicki v. State Board of Elections,* 574 F.Supp. 1082 (N.D.Ill.1983) (three-judge court); *Thomasville Branch of the N.A.A.C.P. v. Thomas County,* Civil No. 75–THOM (M.D.Ga.1983); *Jones v. City of Lubbock,* Civil No. C.A. 5–76–34 (N.D.Tex.1983); *Taylor v. Haywood County,* 544 F.Supp. 1122 (W.D.Tenn.1982) (grant of preliminary injunction). In *Rybicki,* the court found that application of § 2 to a districting plan did not present a retroactivity issue because its analysis focused on the effects of the plan in future elections.

**21.** In *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), four Justices of the Supreme Court opined that vote dilution claims are cognizable solely under the Fourteenth Amendment. Under the plurality's narrow construction, the Fifteenth Amendment bars only a direct, purposeful denial or abridgment of the right of a black person to vote. Since former § 2 of the Voting Rights Act of 1965 "was intended to have an effect no different from that of the Fifteenth Amendment itself," *id.* at 61, 100 S.Ct. at 1496, it likewise was not deemed to support a dilution cause of action. Though the Fourth, Fifth and Eighth Circuits have concluded that the five-Justice majority subscribes to the view that the Fifteenth Amendment gives rise to a dilution claim, *see, e.g., Perkins v. City of West Helena,* 675 F.2d 201 (8th Cir.), *aff'd mem.* —— U.S. ——, 103 S.Ct. 33, 74 L.Ed.2d 47 (1982); *Washington v. Finlay,* 664 F.2d 913 (4th Cir.1981); *Lodge v. Buxton,* 639 F.2d 1358 (5th Cir.1981), *aff'd sub nom. Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), the Supreme Court itself tallies a minority of three. *Rogers v. Lodge,* 458 U.S. 613, 619 n. 6, 102 S.Ct. 3272, 3276 n. 6, 73 L.Ed.2d 1012 (1982) ("Three Justices [Justice Stevens, concurring, and Justices White and Marshall, dissenting] disagreed with the plurality's basis for putting aside the Fifteenth Amend-

ment."). The *Rogers* court expressed no opinion on this issue, leaving undisturbed the plurality's decision with respect to the applicability of the Fifteenth Amendment and the original version of § 2 to dilution claims. *See Campbell v. Gadsen County School Board; McMillan v. Escambia County.* Nor, as discussed *infra,* need we consider the issue.

**22.** Dilution jurisprudence has evolved primarily in the context of constitutional challenges to state at-large or multimember districts. Though the Supreme Court has not directly addressed the issue, this circuit has recognized that the standards for decision developed in the multimember or at-large districting cases govern the adjudication of claims involving the constitutionality of single-member districts. *Nevett v. Sides,* 571 F.2d 209 (5th Cir.1978), *cert. denied,* 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980); *Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977); *Robinson v. Commissioners Court,* 505 F.2d 674 (5th Cir. 1974). *See* R. Dixon, Democratic Representation: Reapportionment in Law and Politics 484 (1968). With regard to the applicability of the dilution rationale to congressional districting cases, we believe the better view is that irrespective of whether a state legislative or congressional districting plan is the subject of dispute, *"'we are required to determine the same question, whether or not there has been an unconstitutional manipulation of the electoral district boundaries so as to minimize or dilute the voting strength of a minority class or interest.'"* *Nevett v. Sides,* 571 F.2d at 219 (quoting from *Robinson v. Commissioners Court,* 505 F.2d at 678) (emphasis in original). *See, e.g., In re: Pennsylvania Congressional Districts Reapportionment Cases,* 567 F.Supp. 1507 (M.D.Pa.1982) (three-judge court), *aff'd sub nom. Simon v. Davis,* —— U.S. ——, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983); *In re: Illinois Congressional Districts Reapportionment Cases,* No. 81–C–3915, (N.D.Ill. 1981) (three-judge court), *aff'd mem. sub nom. Ryan v. Otto,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982).

Similarly, the "totality of circumstances" analysis, derived from the multimember dilution

defendants' challenge to the 1982 amendment to § 2. Defendants take the position that in codifying a test which relieves complainants of the burden of proving invidious intent, Congress has sought to overrule the Supreme Court's holding that such intent must be established as a prerequisite to recovery under either the Fourteenth or Fifteenth Amendments. *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). Given the congruence of § 2 and the Fifteenth Amendment, defendants argue, the separation of powers doctrine precludes Congress from expanding the statute to reach claims founded on discriminatory impact alone. By amending § 2 to accomplish this impermissible aim, the legislature has, in defendants' estimation, usurped the judiciary's exclusive pre-rogative to define the limits of the Constitution.

In amending § 2, Congress reaffirmed "the right of minority voters to be free from election practices, procedures or methods that deny them the same opportunity to participate in the political processes other citizens enjoy." S.Rep. No. 97–417 at 28, U.S.Code Cong. & Admin.News, p. 206. Two principal objectives of the statutory "results" test were posited: to reach discriminatory conduct which might otherwise evade liability under the more stringent intent assay, and to eradicate the contemporary effects of past discrimination. *Id.* at 40; H.R.Rep. No. 97–227, 97th Cong., 1st Sess. 3 (1981). To this end, amended § 2 resurrected the principles applied in voting registration cases prior to *Bolden.*[23]

cases of *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975) (per curiam), is equally applicable to state legislative or congressional districting schemes. According to the Senate Judiciary Committee:

> *Whitcomb* [*v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) ], *White, Zimmer,* and their progeny dealt with electoral system features such as at-large elections, majority vote requirements and [state legislative] districting plans. However, Section 2 remains the major statutory prohibition of *all voting rights discrimination.*

S.Rep. No. 97–417 at 30, U.S.Code Cong. & Admin.News, p. 207 (emphasis added).

**23.** In *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), the Supreme Court identified a panoply of factors relevant to the determination whether a multimember or at-large districting system denied blacks and Hispanic voters full access to the political process. Focusing on whether the districts operated to dilute the voting strength of racial and ethnic minorities, the Court held that "the impact of the district ... constituted invidious discrimination." *Id.* at 767, 93 S.Ct. at 2340. The Former Fifth organized the *White* criteria into a coherent test which permitted the fact of dilution to be established upon proof of the aggregate of these criteria. *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975) (per curiam). Until the Fifth Circuit reconsidered the impact-oriented *Zimmer* analysis in light of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), plaintiffs asserting dilution claims in this circuit could prevail by demonstrating either discriminatory results or intent. *See* authorities cited in *Nevett v. Sides,* 571 F.2d at 232 (Wisdom, J., specially concurring). In *Nevett,* the court ruled that while a showing of invidious intent is essential to recovery under the Fourteenth and Fifteenth Amendments, such intent could be inferred from proof of an aggregate of the *Zimmer* factors.

A plurality of the Supreme Court subsequently rejected the Fifth Circuit's effort, in *Nevett,* to reconcile *Zimmer* with *Washington* and *Arlington Heights* by injecting an intent requirement, opining that *Nevett* was premised on a misapprehension that proof of discriminatory impact permitted an inference of discriminatory intent. Acknowledging that *Zimmer*'s circumstantial factors might "afford some evidence of a discriminatory purpose," the plurality stated that such factors would not alone furnish sufficient evidence thereof. 446 U.S. at 73, 100 S.Ct. at 1503. With respect to the significance of *Bolden,* this court later opined that "... it appears that the Supreme Court has somewhat increased the proof on plaintiffs in [vote dilution] cases." *Accord, Lodge v. Buxton,* 639 F.2d 1358, 1373 (5th Cir.1981), *aff'd sub nom. Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). Comment, The Standard of Proof in At-Large Vote Dilution Discrimination Cases After *City of Mobile v. Bolden,* 10 Fordham Urb. L.J. 103 (1981). A majority of the Supreme Court Justices evidently concurred in this judgment. *See* footnote 22, *infra.*

For an exhaustive survey of vote dilution jurisprudence, from its origins in the seminal case

According to the Report of the Senate Committee on the Judiciary:

> In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure, in the context of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process. Under this results test, it was not necessary to demonstrate that the challenged election law or procedure was designed or maintained for a discriminatory purpose.
>
> In *Bolden,* a plurality of the Supreme Court broke with precedent and substantially increased the burden on plaintiffs in voting discrimination cases by requiring proof of discriminatory purpose. The Committee has concluded that this intent test places an unacceptably difficult burden on plaintiffs. It diverts the judicial inquiry from the crucial question of whether minorities have equal access to the electoral process to a [sic] historical question of individual motives.

S.Rep. No. 97–417 at 16, U.S.Code Cong. & Admin.News, p. 193.[21]

Regardless of whether former § 2 purported to track the Fifteenth Amendment, and thus mandated proof of invidious intent, Congress has since elected to broaden the statutory proscription to embrace conduct which is discriminatory in either purpose or effect. Assuming that amended § 2 constitutes a valid exercise of legislative power, therefore, the *Bolden* court's interpretation of the original § 2 is no longer controlling. Accordingly, we turn for guidance to a long line of Supreme Court cases wherein other key provisions of the 1965 Voting Rights Act have passed constitutional muster, such provisions having been deemed to fall within the purview of Congress' enforcement authority.

Section 4(a) of Act, 42 U.S.C. § 1973b(a), abolishing literacy tests in any jurisdiction where less than 50% of the voting age residents had voted in prior elections, was considered a necessary and proper means of implementing the Fifteenth Amendment in *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966). Addressing the state's contention that Congress had exceeded its enforcement powers under § 2 of the Fifteenth Amendment, the *Katzenbach* court proclaimed that "Congress has full remedial powers to effectuate the constitutional prohibition against racial discrimination in voting." *Id.* at 326, 86 S.Ct. at 817. The Court has since cited *Katzenbach* for the proposition "that congressional authority [embodied in § 2 of the Fifteenth Amendment] extends beyond the prohibition of purposeful discrimination to encompass state action that has discriminatory impact perpetuating the effects of past discrimination." *Fullilove v. Klutz-*

---

of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), to *Bolden,* see the Report on S.1992 of the Senate Judiciary Committee, S.Rep. No. 97–417 at 19–27.

**24.** While reaffirming the *Bolden* purposeful discrimination requirement, the Supreme Court has itself alleviated to some degree the complainant's burden of proof in *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982). In *Rogers,* six Justices approved the Fifth Circuit's reliance upon proof of the factors set forth in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975) (per curiam), to draw an inference of discriminatory intent in a vote dilution case. By approving judicial resort to the *Zimmer* criteria, heretofore adjudged inadequate in *Bolden,* to establish intent, and evincing greater deference to the factual findings of the trial court,

the *Rogers* opinion "signals a significant retreat from the *Bolden* plurality's racial vote dilution analysis and a revitalization of the *Zimmer* factors in the context of an [intent] ... inquiry." Hartman, Racial Vote Dilution, 50 Geo.Wash.L. Rev. at 716–17. *See Buchanan v. City of Jackson,* 708 F.2d 1066 (6th Cir.1983) (because *Bolden* appeared to require direct evidence of discriminatory intent, whereas *Rogers* restores the significance of circumstantial evidence in ascertaining the existence of such intent, the latter represents a marked departure from the plurality's opinion in *Bolden* ); *McMillan v. Escambia County;* Cardwell, Voter Dilution and the Standard of Proof, 14 Urban Law 863 (1982). Dissenting Justices Powell and Rehnquist maintain that the holdings in *Bolden* and *Rogers* cannot be reconciled, suggesting that the *Bolden* rationale has in effect been repudiated by the majority. *Rogers v. Lodge,* 102 S.Ct. at 3281 (Rehnquist and Powell, JJ., dissenting).

*nick,* 448 U.S. 448, 477, 100 S.Ct. 2758, 2774, 65 L.Ed.2d 902 (1980) (dicta).[25]

Later in the 1966 term, in *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), the Supreme Court sustained § 4(e) of the Voting Rights Act of 1965, 42 U.S.C. § 1973b(e), against an attack founded on § 5 of the Fourteenth Amendment. Section 4(e) forbade the use of English literacy tests to deny the right to vote to any person who had attained a sixth grade education in an "American Flag" school, in which the language of instruction was other than English. This provision was aimed at New York's disenfranchisement of Puerto Rican residents. Writing for the majority, Justice Brennan analogized Congress' § 5 authority to, *inter alia,* the plenary grant of the necessary and proper clause, Article I, § 8, cl. 18. Thus, the critical question was "whether § 4(e) may be regarded as an enactment to enforce the Equal Protection Clause, ... whether it is 'plainly adapted to that end,' and whether it is not prohibited by but is consistent with 'the letter and spirit of the constitution.'" *Id.* at 651, 86 S.Ct. at 1723 (quoting from *McCullock v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819)). Notwithstanding the absence of a record of actual discrimination, the Court endorsed Congress' passage of a measure which remedied historical discrimination, and enabled the Puerto Rican community to combat prospective state violations of the Fourteenth Amendment. As Chief Justice Burger subsequently observed, in discussing the import of *Morgan:*

> To uphold this exercise of congressional authority, the Court found no prerequisite that application of a literacy requirement violated the Equal Protection Clause.... It was enough that the Court could perceive a basis upon which Congress could reasonably predicate a judgment that application of literacy qualifications within the compass of § 4(e) would discriminate in terms of access to the ballot and consequently in terms of access to the provision or administration of governmental programs.

*Fullilove v. Klutznick,* 448 U.S. at 477, 100 S.Ct. at 2774 (dicta) (citations omitted).

Congress' enactment of a five-year national ban on the utilization of qualification tests and devices in federal, state and local elections, which took the form of § 2(d) of the Voting Rights Act amendments of 1970, current version codified at 42 U.S.C. § 1973b, was sanctioned by the Court in *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).[26] Although the Justices authored five separate opinions, all nine stressed that Congress is endowed with substantial discretion in enforcing the Reconstruction amendments. Once again, the *Fullilove* court's commentary is instructive:

**25.** In *Klutznick,* a plurality of the Supreme Court upheld the constitutionality of the "minority business enterprise" provision of the Public Works Employment Act of 1977, 42 U.S.C. § 6705(f)(2), which dictates that 10% of federal grants for local public works projects be set aside for minority business enterprises. Chief Justice Burger's plurality opinion displays a deferential attitude toward Congress' exercise of its remedial powers:

> Here we deal ... not with the limited remedial powers of a federal court, ... but with the broad remedial powers of Congress. It is fundamental that in no organ of government, state or federal, does there repose a more comprehensive remedial power than in the Congress, expressly charged by the Constitution with competence and authority to enforce equal protection guarantees. Congress not only may induce voluntary action to as-

> sure compliance with existing federal statutory or constitutional antidiscrimination provisions, but also, where Congress has authority to declare certain conduct unlawful, it may ... authorize and induce state action to avoid such conduct.,

448 U.S. at 483–84, 100 S.Ct. at 2777 (citation omitted).

**26.** At issue in *Mitchell* were provisions of the Voting Rights Act Amendments of 1970, P.L. No. 91–285, which: (1) reduced the minimum voting age in state and federal elections—the latter was upheld by the Court, and the former stricken as unconstitutional; (2) eliminated literacy tests or devices for a five-year term in state and federal elections throughout the country—upheld; and (3) erection of a bar to state requirements disqualifying voters in presidential elections—also upheld.

The [*Mitchell*] Court was unanimous, albeit in separate opinions, in concluding that Congress was within its authority to prohibit the use of such voter qualifications; Congress could reasonably determine that its legislation was an appropriate method of [foreclosing the possibility that purposefully discriminatory administration of literacy tests would escape undetected and] attacking the perpetuation of prior purposeful discrimination, even though the use of these tests or devices might have discriminatory effects only. *Fullilove v. Klutznick*, 448 U.S. at 477, 100 S.Ct. at 2774 (dicta) (citation omitted).

In an opinion issued contemporaneously with *Bolden, City of Rome v. United States*, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), the Supreme Court rejected a constitutional assault on § 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Under § 5, any change in voting or election laws proposed by a covered jurisdiction will not be approved, or "precleared," by the United States Attorney General unless it "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color...." Though fully cognizant that the Fifteenth Amendment prohibits only intentional discrimination, the Court stated that § 2 of that amendment permitted Congress to interdict election procedures which were not in and of themselves motivated by racial animus, but which created the risk of purposeful discrimination or perpetuated the effects of past discrimination. *Id.* at 176, 177, 100 S.Ct. at 1561. At the heart of the decision lies this finding:

Congress could rationally have concluded that, because electoral changes by jurisdictions with a demonstrable history of intentional racial discrimination in voting create the risk of purposeful discrimination, it was proper to prohibit changes that have a discriminatory impact.... We find no reason, then, to disturb Congress' considered judgment that banning electoral changes that have a discriminatory impact is an effective method of preventing States from " 'undo[ing] or

defeat[ing] the rights recently won' by Negroes."

*Id.* at 177–78, 100 S.Ct. at 1561–62 (quoting from *Beer v. United States*, 425 U.S. 130, 140, 96 S.Ct. 1357, 1363, 47 L.Ed.2d 629 (1976)) (citations and footnotes omitted). Such remedial measures need only be "appropriate," within the meaning of *McCulloch v. Maryland*, in order to effectuate substantive rights secured by § 1 of the Fifteenth Amendment.

Similarly, Congress here determined, after extensive hearings and the taking of expert and lay testimony, that the intent test inordinately burdened plaintiffs in vote dilution cases, was unnecessarily divisive due to the charges of racism which must inevitably be leveled against individual officials or entire communities, and, most importantly, compelled protracted, often futile inquiries into the motives of officials who acted many years ago. S.Rep. No. 97–417 at 36–37. Ultimately, the state defendants could all too easily advance racially neutral justifications in rebuttal. In Congress' judgment, the danger that a defendant official would seek to rebut the plaintiff's circumstantial evidence of purposeful discrimination "by planting a false trail of direct evidence in the form of official resolutions, sponsorship statements and other legislative history eschewing any racial motive ... seriously clouds the prospects of eradicating the remaining instances of racial discrimination." *Id.* at 37. *See* Extension of the Voting Rights Act: Hearings Before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 97th Cong., 1st Sess. 1189 (1982) (testimony of Joaquin Avila, counsel for the Mexican-American Legal Defense Fund) (contemporary official discrimination more subtle; smoking gun evidence of racial animus can no longer be discerned in the public record).

Congress thus sought to enact a legislative prophylaxis, calculated to forestall the institution of potentially discriminatory electoral systems and extirpate facially neutral devices or procedures which continue to expose minority voters to harmful

consequences rooted in historical discrimination. S.Rep. No. 97–417 at 40. Summarizing the bases for their conclusions that proper enforcement of the Fourteenth and Fifteenth Amendments required a ban on election procedures and practices which culminate in a denial or abridgement of the right to vote, the drafters found:

(1) that the difficulties faced by plaintiffs forced to prove discriminatory intent through case-by-case adjudication create a substantial risk that intentional discrimination barred by the Fourteenth and Fifteenth Amendments go undetected, uncorrected and undeterred unless the results test proposed for section 2 is adopted; and (2) that voting practices and procedures that have discriminatory results perpetuate the effects of past purposeful discrimination.

*Id.*

We concur in Professor Archibald Cox's interpretation of Supreme Court precedent as vesting Congress with broad discretion, under the Fourteenth and Fifteenth Amendments,

... to outlaw all voting arrangements that result in denial or abridgement of the right to vote even though not all such arrangements are unconstitutional, be-

cause this is a means of preventing their use as engines of purposive and therefore unconstitutional racial discrimination.

Hearings on the Voting Rights Extension Before the Subcommittee on the Constitution of the Senate Judiciary Committee, 97th Cong., 2d Sess. (Feb. 25, 1982) (prepared statement of Professor Archibald Cox at 14). Empirical findings by Congress of persistent abuses of the electoral process, and the apparent failure of the intent test to rectify those abuses, were meticulously documented and borne out by ample testimony. Based on these findings, the legislators reasonably concluded that substantial amelioration of a dilution plaintiff's statutory burden of proof was warranted. Although ostensibly contradictory of the Supreme Court's holding in *Bolden*,[27] we perceive § 2 as merely prescribing a potion to remove the vestiges of past official discrimination and to ward off such discrimination in the future. Congress has not expanded the Constitution's substantive guarantees but has simply redefined and strengthened the statutory protections around core constitutional values, thus exercising its authority within the confines of the Constitution.[28] Or, as the president of

**27.** Recognizing that it wielded a figurative two-edged sword, one which might be turned against it in such controversial areas as school prayer, busing and abortion, the Senate Judiciary Committee reasoned:

It has been suggested that the Committee bill [S.1992] would overturn a constitutional decision by the Supreme Court [*Bolden*], in spite of the strenuous opposition of some of the bill's proponents to unrelated Congressional efforts to override *Supreme Court decisions* in other areas by statute rather than by constitutional amendment.

This argument simply misconstrues the nature of the proposed amendment to section two. Certainly, Congress cannot overturn a substantive interpretation of the Constitution by the Supreme Court. Such rulings can only be altered under our form of government by constitutional amendment or by a subsequent decision by the Court.

Thus, Congress cannot alter the judicial interpretations in *Bolden* of the Fourteenth and Fifteenth Amendments by simple statute. But the ... amendment to section two does not seek to reverse the Court's constitutional in-

terpretation ... [and] is a proper exercise of Congress' enforcement power.

S.Rep. No. 97–417 at 41, U.S.Code Cong. & Admin.News, p. 219.

**28.** One commentator postulates:

Because the [results] test is designed to reach those electoral schemes that are most likely to permit purposeful discrimination to escape detection, to perpetuate the effects of past discrimination, or to facilitate purposeful discrimination in the provision of public services, amended section 2 must be regarded as within the scope of congressional power under the enforcement clauses of the Fourteenth and Fifteenth Amendments. To hold otherwise the Supreme Court would have to depart sharply from precedent and adopt Justice Rehnquist's view [outlined in his dissenting opinion in *City of Rome v. United States*] that the congressional enforcement role is limited to providing remedies that do not reach beyond the prohibitions of the amendments themselves as interpreted by the Supreme Court.

the American Bar Association opined before the Senate Judiciary Committee,

> Under this Amendment, the Supreme Court's interpretation of the proper constitutional standard ... [is] left intact. Only the section 2 statutory standard [is] changed....

Hearings on the Voting Rights Act Extension Before the Subcommittee on the Constitution of the Senate Judiciary Committee, 97th Cong., 2d Sess. (Feb. 25, 1982) (prepared statement of David R. Brink at 7).

Senate critics of § 2, led by Senator Orrin Hatch, raised the specter of overbreadth, arguing that the exceptional conditions justifying unequal application of § 5 to jurisdictions with a history of intentional discrimination did not support the extension of a nationwide ban encompassing noncovered jurisdictions. Subcommittee on the Constitution of the Senate Committee on the Judiciary, 97th Cong., 2d Sess., Voting Rights Act, Report on S.1992, *reprinted in* S.Rep. No. 97–417 at 170–71. Absent a record suggesting that voting discrimination permeates the entire nation, the Senate Subcommittee on the Constitution maintained that the sweeping reforms contemplated by § 2 could not be described as remedial in character, and were consequently beyond the scope of congressional enforcement powers. *Id.* at 171. *Accord,* Note, Amending Section 2 of the Voting Rights Act of 1965, 32 Case W.Res.L.Rev. 500 (1982). *Cf. Rogers v. Lodge,* 102 S.Ct. at 3283 (Stevens, J., dissenting) (emphasis added) ("Nor, in my opinion, could there be any doubt about the constitutionality of an amendment to the Voting Rights Act that would require ... *covered* jurisdictions to abandon the specific kinds of at-large voting schemes that perpetuate past discrimination.").

As the Senate Judiciary Committee pointed out, however, the § 5 analogy "overlooks the fundamental difference in the degree of jurisdiction needed to sustain the extraordinary nature of preclearance, on the one hand, and the use of a particular legal standard to prove discrimination in court suits on the other." S.Rep. No. 97–417 at 42. *See Vance v. Terrazas,* 444 U.S. 252, 265–66, 100 S.Ct. 540, 547–48, 62 L.Ed.2d 540 (1980). Nor do the critics take into consideration the *Mitchell* court's declaration of the constitutionality of § 2 of the Voting Rights Act amendments of 1970, striking down literacy tests and devices in both covered and noncovered jurisdictions. Whatever their disagreement on other issues, the members of the Court unanimously endorsed the literacy test provision.[29]

In the final analysis, the self-limiting character of § 2 effectively refutes the overbreadth argument. Since this statute does not impose an absolute ban on specific election practices, or allow liability to attach without a finding of dilution under the totality of circumstances in a given case, the fear that § 2 will precipitate a nationwide revision of state election laws is groundless. Only a state law shown to discriminatorily impact against minority voters will run afoul of § 2.

---

Hartman, Racial Vote Dilution, 50 Geo.Wash.L. Rev. at 748 (footnotes omitted).

**29.** *Oregon v. Mitchell,* 400 U.S. at 131–34, 91 S.Ct. at 268–69 (majority opinion, authored by Black, J.); *id.* at 144–47, 91 S.Ct. at 274–76 (Douglas, J., concurring in part and dissenting in part); *id.* at 216–17, 91 S.Ct. at 310–11 (Harlan, J., concurring in part and dissenting in part); *id.* at 233–36, 91 S.Ct. at 319–320 (Brennan, White and Marshall, JJ., dissenting in part and concurring in part); *id.* at 281–84, 91 S.Ct. at 343–44 (Stewart, J., concurring in part and dissenting in part). Justice Harlan remarked:

Despite the lack of evidence of specific instances of discriminatory application or effect, Congress could have determined that racial prejudice is prevalent throughout the Nation, and that literacy tests unduly lend themselves to discriminatory application, either conscious or unconscious. This danger of violation of § 2 was sufficient to authorize the exercise of congressional power. The danger of violation of § 1 of the Fifteenth Amendment was sufficient to authorize the exercise of congressional power under § 2.

*Id.* at 216, 91 S.Ct. at 310 (Harlan, J., concurring in part and dissenting in part) (footnotes omitted).

Federalism concerns expounded by § 2 opponents, *see, e.g.,* 128 Cong.Rec. S.6786 (daily ed., June 15, 1982, remarks of Senator Harry Byrd); *id.* at S.6517 (daily ed., June 9, 1982) (remarks of Senator Hatch), and reiterated by defendants herein, are closely related to the separation of powers question. Defendants suggest that § 2 contravenes the principle of state sovereignty enshrined in the Tenth Amendment, which precludes Congress from wielding its legislative power to impair the States' freedom to structure integral operations in areas of traditional governmental functions. *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (Fair Labor Standards Act, a Commerce Clause enactment, held unconstitutional as applied to state employees). *Usery* explicitly declined to entertain the question of whether different results might obtain were Congress to encroach upon integral operations of state governments through the exercise of authority conferred by § 5 of the fourteenth amendment. *See City of Rome v. United States,* 446 U.S. at 178–79, 100 S.Ct. at 1562.

In *South Carolina v. Katzenbach,* the Court ruled that Congress may, as against the reserved powers of the state, utilize any rational means to implement the Fifteenth Amendment. Justice Marshall subsequently rejected a federalism argument predicated on *Usery,* explaining that:

> ... principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments "by appropriate legislation." Those Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty. Applying this principle, we hold that Congress had the authority to regulate state and local voting through the provisions of the Voting Rights Act. *National League of Cities,* then, provides no reason to depart from our decision in *South Carolina v. Katzenbach* that "the Fifteenth Amendment supersedes contrary exertions of state power," ... and that the Act is an appropriate means for carrying out Congress' constitutional responsibilities....

*City of Rome v. United States,* 446 U.S. at 179–80, 100 S.Ct. at 1562–63 (citations and footnotes omitted). *Accord, Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (§ 5 of the Fourteenth Amendment overcomes state Eleventh Amendment immunity). *City of Rome* therefore teaches that the Tenth Amendment does not constrict congressional power to enforce the Reconstruction amendments by appropriate legislation. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 287 n. 28, 101 S.Ct. 2352, 2366 n. 28, 69 L.Ed.2d 1 (1981) (dicta). Given our conclusion that § 2 is an appropriate expression of congressional enforcement authority, we are persuaded that this measure does not work an unconstitutional abrogation of powers allocated to the states by the Tenth Amendment.

## B. *Application of Act 20.*

■ Congressional districts may be equal or, as here, substantially equal in population, yet fail to secure fair and effective representation for all voters. Through the cartographic technique known as gerrymandering,[30] a politically dominant group is

---

**30.** "Gerrymandering" refers to "discriminatory districting which operates unfairly to inflate the political strength of one group and deflate that of another." R. Dixon, The Court, the People and "One Man, One Vote," in Reapportionment in the 1970s 7 (N. Polsby, ed. 1971). Dr. Engstrom defines the "equipopulous gerrymander" as "districting that satisfies the one person, one vote requirement yet is discriminatory toward an identifiable group of voters." Engstrom, The Supreme Court and Equipopulous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation, 1976 Ariz.

State L.J. 277, 278 n. 5. Justice Stevens recently warned that slavish judicial adherence to the goal of perfect population equality is " 'perfectly compatible with gerrymandering of the worst sort.' " *Karcher v. Daggett,* —— U.S. ——, 103 S.Ct. 2653, 2671, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring) (*quoting from Wells v. Rockefeller,* 394 U.S. 542, 551, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969) (Harlan, J., dissenting). *Accord, id.* 103 S.Ct. at 2863 (White, J., dissenting, joined by Burger, C.J., and Rehnquist and Powell, JJ.); *id.* at 2869 (Powell, J., dissenting).

able to manipulate district lines within the constraints of Article I, § 2, so as "to minimize or cancel out the voting strength of racial or political elements of the voting population." *Fortson v. Dorsey,* 379 U.S. 433, 439, 85 S.Ct. 498, 501, 13 L.Ed.2d 401 (1965). *See Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). The amended § 2, Congress' response to the continuing concern over the extent of minority participation in the electoral process, provides a formidable vehicle for redressing vote dilution claims.

Pursuant to amended § 2, a complainant has the option of either proving a discriminatory purpose in the adoption or maintenance of an electoral structure or practice, or demonstrating, "based on the totality of circumstances," that the structure or practice *results* in a dilution of minority voting power. 42 U.S.C. § 1973b. *See City of Lockhart v. United States,* —— U.S. ——, 103 S.Ct. 998, 1004, 74 L.Ed.2d 863 (1983) (Marshall, J., concurring); *Buchanan v. City of Jackson; Rybicki v. State Board of Elections.* Listed in the Senate Report are several objective factors, drawn from *White v. Regester* and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975) (per curiam), which a court may evaluate in applying § 2's "totality of circumstances" test:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance that opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution.

S.Rep. No. 97–417 at 28–29, U.S.Code Cong. & Admin.News, p. 207 (footnotes omitted).

No particular number or arrangement of factors need be proved as a prerequisite to recovery, nor is a plaintiff limited to evidence that fits within the *Zimmer-White* analytic framework. To the extent that the enumerated factors are not factually relevant, they may be replaced or substituted by other, more meaningful factors. Mindful of *Zimmer's* command that these indicia of discrimination are neither exclu-

sive nor controlling, the Senate Judiciary Committee cautioned:

> The courts ordinarily have not used these factors, nor does the Committee intend them to be used, as a mechanical "point counting" device. The failure of plaintiff to establish any particular factor, is not rebuttal evidence of non-dilution. Rather, the provision [§ 2] requires the court's overall judgment, based on the totality of circumstances and guided by those relevant factors in the particular case, of whether the voting strength of minority voters is, in the language of *Fortson* and *Burns*, minimized or canceled out.

*Id.* at 29 n. 118.

■ Upon review of the totality of circumstances in the instant case, the court is satisfied that the plaintiffs have made out a prima facie case of vote dilution under § 2. Evidence of "past discrimination cannot, in the manner of original sin, condemn action that is not in itself unlawful," *City of Mobile v. Bolden,* 446 U.S. at 74, 100 S.Ct. at 1503, but is relevant insofar as it impacts adversely on a minority group's present opportunities to participate in government. We are persuaded that the deleterious repercussions of historical discrimination persist in hindering the political access of minorities in Orleans Parish.[31]

■ As the Supreme Court commented in *Rogers v. Lodge,* 102 S.Ct. at 3279, "[v]oting along racial lines allows those elected to ignore black interests without fear of political consequences, and without bloc voting the minority candidates would not lose elections solely because of their race." The importance of polarized voting cannot be underestimated, for if it does not exist, the minority voter "has little reason to complain...." *United Jewish Organization v. Carey,* 430 U.S. 144, 166 n. 24, 97 S.Ct. 996, 1010 n. 24, 51 L.Ed.2d 229 (1977). *See Lodge v. Buxton,* 639 F.2d 1358 (5th Cir.1981), *aff'd sub nom. Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1981). A consistently high degree of electoral polarization in Orleans Parish was proven through both statistical and anecdotal evidence. Particularly as enhanced by Louisiana's majority vote requirement,[32] racial bloc voting substantially impairs the ability of black voters in this parish to become fully involved in the democratic process. That several black candidates, among them Mayor Morial, have won office in Orleans Parish does not foreclose a finding of dilution. *See* S.Rep. No. 97–417 at 29 n. 115; *Campbell v. Gadsen County School Board; Zimmer v. McKeithen.* Considering the parish's 55% black population, the 15% success rate of black candidates at the polls is substantially lower than might be anticipated absent such impediments to black voting and registration as the lingering ramifications of historic disenfranchisement conjoined with past and present disparities in education, income, employment and housing. Professor Hen-

---

**31.** A causal nexus between the disparate socioeconomic status of blacks arising from past discrimination and a depressed level of minority political participation need not be established. S.Rep. No. 97–417 at 29 n. 114 (*citing White v. Regester* and *Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977)). "Inequality of access is an inference which flows from the existence of economic and educational inequalities." *Kirksey v. Board of Supervisors,* 554 F.2d at 145. Plaintiffs have nevertheless succeeded in demonstrating that the contemporary effects of past discrimination furnish at least a partial explanation for the low black registration and voting apparent in Orleans Parish.

**32.** Severely criticized for its tendency to submerge racial minorities, *Zimmer v. McKeithen,* the majority vote requirement:

> ... requires a run-off election between the two candidates with the most votes if no candidate receives a majority in the first election. The run-off allows white voters who scattered their votes among various white candidates in the first election to consolidate their vote in the second to defeat a minority candidate who received a plurality of the vote in the first election.

Note, Racial Vote Dilution in Multimember Districts: The Constitutional Standard after *Washington v. Davis,* 76 Mich.L.Rev. 694, 697 (1978). For obvious reasons, the inability of minorities to form coalitions or to otherwise influence other groups due to polarization is exacerbated by the majority vote requirement.

derson's analysis of voting patterns in Orleans Parish shows that the victories of blacks in municipal, parish and state representative or senate contests can be ascribed in major part to racial bloc voting and some cross-over voting by a unique enclave of liberal whites. If Act 20's sundering of the black populace of New Orleans were allowed to stand, the effective independent impact of black voters would be unfairly and illegally minimized.

A tenuous state policy supportive of a particular districting scheme is probative of the question of the fairness or the unfairness of that scheme's impact on minority voters. S.Rep. No. 97–417 at 29. Departures from the normal procedural sequence, or the specific chain of events leading up to a particular legislative decision, bear on the weight to be accorded the state policy underlying a particular voting system or practice. *See id. See also Karcher v. Daggett,* —— U.S. ——, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring). After extensive public hearings and consultations with staff counsel, committees of both houses of the legislature formulated a reapportionment policy tailored to maximize black voting strength within one of Louisiana's eight congressional districts. To implement this benign, race-conscious policy, the legislature, through its joint committee, promulgated a set of neutral reapportionment criteria which culminated in the preparation and bicameral approval of the Nunez Plan.[33]

The Louisiana Legislature's policy, which would have maintained New Orleans' black community within one district, and virtually all neutral apportionment guidelines, were abruptly discarded in the face of the Governor's veto threat. No cohesive goals replaced the abandoned policy. Further, rather than utilizing the routine mechanism of the conference committee following the House's withdrawal of its approval of the Nunez Plan, the legislative leaders convened a private meeting to seek a solution which would satisfy the Governor and the Jefferson Parish forces. Because all were aware that the conflicting objectives of the Governor and black legislators with respect to a black majority district could not be harmonized, the latter were deliberately excluded from the final decision-making process.

Physical evidence of racial gerrymandering may itself furnish strong, objective proof of vote dilution. *Rybicki v. State Board of Elections;* Adams, A Model State Reapportionment Process: The Continuing Quest for "Fair and Effective Representation," 14 Harv.J.Leg. 825 (1977). Minority voting strength may be dissipated through one of two familiar gerrymandering techniques: "stacking," or the overconcentration of members of a specific group in numbers greatly in excess of the percentage required to exercise a meaningful choice at the ballot box, or "cracking," the division of a cohesive population concentration. *Karcher v. Daggett,* 103 S.Ct. at 2672 n. 13 (Stevens, J., concurring); *Nevett v. Sides,* 571 F.2d at 219; R. Morrill, Political Redistricting and Geographic Theory at 14–15, 19–20 (1981). *See also United Jewish*

---

**33.** It is well-established that a legislative body may consider race in drawing district lines, so long as it does not discriminate invidiously or contravene the one person/one vote precept. *See Fullilove v. Klutznick,* 448 U.S. at 483, 100 S.Ct. at 2777 ("... a state may employ racial criteria that are reasonably necessary to assure compliance with federal voting rights legislation, even though the state action does not entail the remedy of a constitutional violation"); *United Jewish Organizations of Williamsburgh, Inc. v. Carey; Wyche v. Madison Parish Police Jury,* 635 F.2d 1151 (5th Cir.1981); *Marshall v. Edwards,* 582 F.2d 927 (5th Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979). In *Carey,* the Court made it clear that legislatures may engage in racially proportionate redistricting:

> "[C]ourts have [no] constitutional warrant to invalidate a state plan, otherwise within tolerable population limits, because it undertakes, not to minimize or eliminate the political strength of any group or party, but to recognize it and, through districting, provide a rough sort of proportional representation in the legislative halls of the State."

430 U.S. at 168, 97 S.Ct. at 1011 (*quoting from Gaffney v. Cummings,* 412 U.S. at 752, 93 S.Ct. at 2331). *See* Note, Group Representation and Race-Conscious Apportionment: The Roles of States and the Federal Courts, 91 Harv.L.Rev. 1847 (1978).

*Organizations, Inc. v. Carey*, 430 U.S. at 158, 97 S.Ct. at 1006. When a redistricting plan employs the latter technique in a racially polarized environment, the result is predictable:

> Like a multimember plan, [a single-member district plan which fractures a geographically concentrated minority voting population] ... tends to dilute the voting strength of the minority. In *Robinson v. Commissioner's Court, supra*, a panel of this court noted that

>> "The most crucial and precise instrument of the ... denial of the black minority's equal access to political participation, however, remains the gerrymander of precinct lines so as to fragment what could otherwise be a cohesive minority voting community.... This dismemberment of the black voting community ... [may have] the ... effect of debilitating the organization and decreasing the participation of black voters."

*Kirksey v. Board of Supervisors*, 554 F.2d 139, 149 (5th Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977) (*quoting from Robinson v. Commissioner's Court*, 505 F.2d 674, 679 (5th Cir.1974). *See also Carstens v. Lamm*, 543 F.Supp. 68, 82 (D.Colo.1982) (three-judge court) ("... a redistricting plan ... should not fracture a natural racial or ethnic community....").

 Act 20's jagged line dissects a large concentrated community of black voters residing in Orleans Parish, dispersing that community into the First and Second Congressional Districts.[34] With unerring precision, this line slices through the City's traditional political subunit, the ward, in a racially selective manner, leaving intact predominantly white wards while carving up those densely populated by blacks. Homogeneous black precincts are separated; white precincts are not. Racial divisions have been preserved at the expense of parish boundaries[35] and respect for the integrity of a natural geographic barrier, the Mississippi River.[36] Discordant communities of interest, those of New Orleans' old-

---

**34.** Expert testimony of Dr. Henderson establishes that these districts do not comply with the generally accepted reapportionment requirement of compactness. Shape, a subcomponent of that requirement, *see Karcher v. Daggett*, 103 S.Ct. at 2672–73 (Stevens, J., concurring), is one criterion by which district contours may be judged in a gerrymandering case. *Id.;* Engstrom, The Supreme Court and Equipopulous Gerrymander 1976, Ariz.St.L.J. at 280; Reock, Measuring Compactness as a Requirement of Legislative Apportionment, 5 Midwest J.Poli.Sci. 70, 71 (1971). Justice Stevens nonetheless cautions against exclusive reliance upon odd or tortured configurations. —— U.S. at —— n. 15, 103 S.Ct. at 2672 n. 15. As Dr. Engstrom points out, "preoccupation with shapes may simply 'confuse form with function,' as relatively symmetrical, compact, districts may effectively dilute a group's voting strength...." 1976 Ariz.St. L.J. at 280 (*quoting from* R. Dixon, Democratic Representation: Reapportionment in Law and Politics 459 (1968)). While acknowledging this concern, Professor Morrill is of the opinion that a compactness measure provides an efficacious defense against gerrymandering. R. Morrill, Political Redistricting and Geographic Theory at 21. It is important to note, however, that compactness is not demanded by federal law. *Carstens v. Lamm; Skolnick v. State Electoral Bd.*, 336 F.Supp. 839 (N.D.Ill.1971) (three-judge court).

**35.** Another non-constitutional restraint imposed on cartographers is the principle that district lines must be drawn to coincide with governmental units such as the parish, ward or precinct. *See* R. Morrill, Political Redistricting and Geographic Theory at 25 ("... use of political entities [erects] ... a significant barrier to gerrymandering whether for racial or partisan political reasons, since it prevents stringing together precincts of a particular character out of disparate political units"). "Indiscriminate districting, without any regard for political subdivision ... lines, may be little more than an open invitation to partisan gerrymandering." *Reynolds v. Sims*, 377 U.S. 533, 578–79, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964); American Bar Association Special Committee on Election Law and Voter Participation, Congressional Redistricting at 12 (1981) (Unnecessary disruption of these units not only "undermines the ability of constituencies to organize effectively but also ... increases the likelihood of voter confusion regarding other elections based on political subdivision geographics.").

**36.** A plan's divergence from natural physical features, which tend to inject some regularity in district configurations, may, absent a legitimate justification such as adherence to the one person/one vote concept, violate the compactness requirement. *See* testimony of Dr. Gordon Henderson, Record, Vol. I at 101–06. Here, the

er, urban core and its surrounding suburban neighborhoods, are joined.[37] Drs. Henderson and Engstrom both testified that when coupled with the phenomenon of racially polarized voting, this combination of factors operated to minimize, cancel or dilute black voting strength.

In the course of our analysis, we are not unmindful of the legitimate debate among academics and courts about the relative merits of concentrating a minority population within one district or dividing that population into two or more districts so that it exerts a substantial influence in each.[38] We are convinced that in the present case, the division of the black population was not designed to enhance the effectiveness of the black electorate, nor is it likely to occasion such.

Application of amended § 2's "results" test to the aggregate of the facts adduced at trial, including Louisiana's history of discrimination and the impact of that history on the present ability of blacks in Orleans Parish to join in the political process, the vestiges of discrimination which take the form of a marked disparity in the socioeconomic conditions under which blacks and whites currently subsist, the parish's racially polarized voting, as exacerbated by the state's majority vote requirement, the tenuousness of the state policy underlying Act 20 and the history of its enactment, and the manipulation of district boundary lines so as to fracture a cohesive minority voting bloc, preponderates in favor of the plaintiffs. Circumstantial evidence that race played a role in the confection of Act

Mississippi is significant insofar as it affects persons residing on either bank. Orleans Parish's inner city blacks, separated from Jefferson Parish by the river, possess far different concerns from the suburban whites who dwell in the latter.

**37.** By way of explanation of the significance of this apportionment criterion, Morrill observes:

Citizens vote, in part, according to their identification with various interests, for example, religious values, occupation, class, or rural or urban orientation. There is a strong basis in arguing that "effective representation" or influence on the outcome is enhanced by grouping of like interests together.... This is constitutionally required only with respect to race. The geographer will also observe that districts which correspond somewhat to nodal regions, a core urban area and its economic or cultural hinderland united by transportation and communications, will have a greater sense of unity, awareness of common problems, and, perhaps, participation than districts which arbitrarily combine disparate areas and ignore patterns of regional identity and loyalty.

R. Morrill, Political Redistricting and Geographic Theory at 23. *See also Busbee v. Smith,* 549 F.Supp. 494 (D.D.C.1982) (three-judge court), *aff'd mem.,* — U.S. —, 103 S.Ct. 809, ·74 L.Ed.2d 1010 (1983); *Carstens v. Lamm,* (three-judge court) (preservation of entire city as one district facilitated voter identity); again, this criterion is not prescribed by federal statutory or constitutional law. *See id.*

**38.** *See, e.g., Seamon v. Upham,* 536 F.Supp. 931, 949 (E.D.Tex.) (three-judge court) *rev'd on other grounds,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d

725 (1982) ("... [t]here is no agreement on whether the political interests of a minority group are best maximized by an overwhelming majority in a single district, are majorities in more than one district or a substantial proportion of the voters in a number of districts"); *United States v. Board of Supervisors of Forrest County,* 571 F.2d 951, 956 and n. 10 (5th Cir. 1978) (citing various commentators). *Compare Jordan v. Winter,* 541 F.Supp. 1135, 1143 (N.D. Miss.1982) (three-judge court), *vacated and remanded for further consideration in light of amended § 2,* — U.S. —, 103 S.Ct. 2077, 77 L.Ed.2d 291 (1983) (where legislative preference for two minority districts with at least 40% population expressed, court found no constitutional or federal statutory bar thereto) with *Kirksey v. Board of Supervisors,* 554 F.2d at 150 (emphasis in the original) ("Where the cohesive black voting strength is fragmented among districts, [even] the presence of districts with bare black *population majorities* not only does not necessarily preclude dilution but ... may actually enhance the possibility of continued minority political impotence."); Hartman, Racial Vote Dilution and Separation of Powers, 50 Geo. Wash.L.Rev. at 695 ("... the argument that the position of the minority is necessarily enhanced by an opportunity for "coalition building" [through a districting plan that disperses their votes among several districts] is disingenuous, to say the least, when made in reference to a locale with well-established patterns of racial division and racial bloc voting where the minority has systematically been submerged and ignored."); Note, Constitutional Challenges to Gerrymanders, 45 U.Chi.L.Rev. 845, 846 (1978) (splitting a voting group among several districts may have the effect of diluting the political power of that group).

20 also figures in the court's calculus, although we have not engaged in the intent analysis permitted by § 2.[39] Based on the totality of relevant circumstances, therefore, the court concludes that the contours of the First and Second Congressional Districts, as established by Act 20, operate to deny or abridge the rights of minority voters, who are accorded less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

Defendants' showing that political motivations were the primary impetus behind the configuration of the First and Second Districts does not provide persuasive rebuttal evidence of nondilution. We agree that legislators do not operate in a vacuum; hence, partisan politics cannot realistically be divorced from any redistricting effort. *See Gaffney v. Cummings*, 412 U.S. at 753, 93 S.Ct. at 2331; *In re: Pennsylvania Congressional Districts Reapportionment Cases*, 567 F.Supp. 1507 at 1529 (M.D.Pa.1982), *aff'd mem. sub nom. Simon v. Davis*, — U.S. ——, 103 S.Ct. 3564, 77 L.Ed.2d 1405 (1983). The protection of existing relationships among incumbents and their constituents, and the benefits accruing to the state from the seniority its delegation may have achieved in Congress, are pragmatic considerations which often figure prominently in the drawing of congressional districts. These considerations are not talismanic, however, and may not serve to protect incumbents by imposing an electoral scheme which splinters a geographically concentrated black populace within a racially polarized parish, thus minimizing the black citizenry's electoral participation.

Nor do other factors invoked by defendants overcome plaintiffs' *prima facie* showing. Reliance on New Orleans' tradition of dual congressional representation can no longer be justified in light of the City's substantial decline in population. Nor is there credible demographic evidence that the black population of either the First or Second Districts will increase to a significant degree over the next decade. Accordingly, the court is of the opinion that plaintiffs are entitled to judgment on their voting dilution claim.

### C. Remedy

Having determined that Act 20 does not, in respect to the First and Second Congressional Districts, comply with the mandate of amended § 2 of the Voting Rights Act of 1965, judgment will be entered declaring Act 20 violative of federal law and enjoining the defendants from conducting elections pursuant to its terms. Recognizing that "state legislatures have 'primary jurisdiction' over legislative reapportionment," *White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973), we shall temporarily defer further action in order to provide the Louisiana Legislature with a reasonable opportunity to act within federal statutory and constitutional limits and enact a valid new plan for the election of members to the United States House of Representatives.[40] Once a court declares an existing legislative reapportionment scheme unlawful, it is "appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional [or federal statutory] requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978). *See also McDaniel v. Sanchez*, 452 U.S. 130, 101

---

**39.** Given our conclusion that Act 20 results in a dilution of black voting strength, we need not draw the ultimate inference of purposeful discrimination from the composite of factors heretofore outlined. The court has nevertheless taken into account, as but one aspect of the totality of circumstances, the evidence that opposition to the creation of majority black district was responsible, to a significant extent, for the defeat of the Nunez Plan and the substitution of Act 20.

**40.** Defendants urged this alternative during oral argument, requesting that in the event of Act 20's invalidation, the court forego the imposition of a judicially-constructed plan and permit the legislature to attempt the confection of a new plan.

S.Ct. 2224, 68 L.Ed.2d 724 (1981); *Connor v. Finch,* 431 U.S. 407, 97 S.Ct. 1828, 52 L.Ed.2d 465 (1977); *Flateau v. Anderson,* 537 F.Supp. 257 (S.D.N.Y.1982) (three-judge court), *cert. dism.,* 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1983). The filing period for congressional candidates will be during the summer of 1984. Thus, there is ample time for the legislature to meet and consider a new redistricting scheme.

Should the legislature, or the Governor, choose not to act, we shall acquit our responsibility to develop and implement a remedial plan. Accordingly, defendants are invited to present to this court, on or before January 31, 1984, a duly-enacted legislative plan. This court will reconvene on February 6, 1984 to entertain the parties' suggestions for congressional districting. In the absence of an acceptable legislative solution, the court will fashion an appropriate plan. Consideration of plaintiffs' request for attorneys' fees and costs shall be deferred until adoption of an appropriate remedy.

Counsel shall promptly prepare and present to the court a judgment consistent with this memorandum opinion.

IT IS SO ORDERED.

APPENDIX A

APPENDIX B

NUNEZ S.B. NO. 5

DISTRICT 1 ☐
DISTRICT 2 ▓

Black Voter Registration
District One 12%
District Two 43%

APPENDIX C

ACT 20

DISTRICT 1
DISTRICT 2

Black Voter Registration
District One 21%
District Two 39%